UNITED STATES of America
v.
H. Paul MORELOCK.

UNITED STATES of America
v.
Ray HAINES.

UNITED STATES of America
v.
Lawrence H. HAINES.

UNITED STATES of America
v.
Lawrence H. HAINES, Jr.

UNITED STATES of America
v.
Rodney G. HAINES.

UNITED STATES of America
v.
Herbert A. HULL.

UNITED STATES of America
v.
Paul S. STERNER.

UNITED STATES of America
v.
Lindsay B. SHAFER, Lewis Shafer, and Joseph Shafer, individually and as copartners doing business as Shafer Brothers, and Shafer Brothers, a partnership.

UNITED STATES of America
v.
Lewis SHAFER.

Civ. A. Nos. 7692–7701.

United States District Court
D. Maryland, Civil Division.
Oct. 11, 1954.

George Cochran Doub, U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md., Joseph B. Zimowski, Atty. Dept. of Agriculture, Washington, D. C., for plaintiff.

Wilson K. Barnes, Baltimore, Md. and Stanford Hoff, D. Eugene Walsh and John Wood, Jr., Westminster, Md., for defendant.

THOMSEN, District Judge.

Defendants, operators and in some cases owners or part owners of farms in Carroll County, Maryland, were producers of wheat for harvest in 1954 within the meaning of the Agricultural Adjustment Act of 1938, 52 Stat. 31, as amended, 7 U.S.C.A. § 1281, et seq. The government has brought these nine suits (a) to restrain defendants from interfering with the entry on their respective farms by the Carroll County Committee or its representatives for the purpose of measuring the acreage planted to wheat for harvest in 1954, (b) to require defendants to identify to such Committee or representatives all the fields or acres on which wheat was planted on the respective farms for harvest in 1954, and (c) for other and further relief, alleging that defendants have refused such entry and such identification.

The principal questions in each case are: (1) Would the granting of the relief prayed violate rights protected by the Fourth, Fifth and Tenth Amendments to the Constitution? (2) Is it a suit "specifically to enforce the provisions" of the Act, 7 U.S.C.A. § 1376? (3) What is the effect of the failure of the agency to follow its own prescribed procedures? (4) Under all the circumstances of the case, is the government entitled to equitable relief?

### The Act

"The general scheme of the Agricultural Adjustment Act of 1938 as related to wheat is to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high

wheat prices and obstructions to commerce. Within prescribed limits and by prescribed standards the Secretary of Agriculture is directed to ascertain and proclaim each year a national acreage allotment for the next crop of wheat, which is then apportioned to the states and their counties, and is eventually broken up into allotments for individual farms. Loans and payments to wheat farmers are authorized in stated circumstances." Wickard v. Filburn, 317 U.S. 111, at page 115, 63 S.Ct. 82, at page 84, 87 L.Ed. 122.

7 U.S.C.A. § 1340 defines the terms "farm marketing quota" and "farm marketing excess" for any crop of wheat,

provides for penalties on the farm marketing excess and for the storage of the farm marketing excess with the Secretary to avoid penalties. It further provides: "(7) A farm marketing quota on corn or wheat shall not be applicable to any farm on which the acreage planted to the commodity is not in excess of fifteen acres"; and "(8) Until the farm marketing excess * * * is stored or delivered to the Secretary or the penalty thereon is paid, each bushel of the commodity produced on the farm which is sold by the producer to any person within the United States shall be subject to the penalty * * *", which shall be paid by the buyer. The important portions of this section are set out in Note 1 below.

1.              The Act
7 U.S.C.A. § 1340—
"(1) The farm marketing quota under this chapter for any crop of wheat shall be the actual production of the acreage planted to wheat on the farm, less the normal production or the actual production, whichever is the smaller, of that acreage planted to wheat on the farm which is in excess of the farm acreage allotment for wheat. * * *

"The normal production, or the actual production, whichever is the smaller, of such excess acreage is hereinafter called the 'farm marketing excess' of corn or wheat, as the case may be. For the purposes of this section, 'actual production' of any number of acres of corn or wheat on a farm means the actual average yield of corn or wheat, as the case may be, for the farm times such number of acres.

"(2) During any marketing year for which quotas are in effect, the producer shall be subject to a penalty on the farm marketing excess of corn and wheat. The rate of the penalty on wheat shall be 45 per centum of the parity price per bushel of wheat as of May 1 of the calendar year in which the crop is harvested.

"(3) The farm marketing excess for corn and wheat shall be regarded as available for marketing, and the penalty and the storage amount or amounts to be delivered to the Secretary of the commodity shall be computed upon the normal production of the excess acreage. * * *

"(4) Until the producers on any farm store, deliver to the Secretary, or pay the penalty on, the farm marketing excess of any crop of corn or wheat, the entire crop of corn or wheat, as the case may be, produced on the farm shall be subject to a lien in favor of the United States for the amount of the penalty. * * *

"(7) A farm marketing quota on corn or wheat shall not be applicable to any farm on which the acreage planted to the commodity is not in excess of fifteen acres. * * *

"(8) Until the farm marketing excess of corn or wheat, as the case may be, is stored or delivered to the Secretary or the penalty thereon is paid, each bushel of the commodity produced on the farm which is sold by the producer to any person within the United States shall be subject to the penalty as specified in paragraph (2) of this section. Such penalty shall be paid by the buyer, who may deduct an amount equivalent to the penalty from the price paid to the producer. * * *

"(12) Notwithstanding any of the foregoing provisions, the farm marketing excess for any crop of wheat for any farm shall not be larger than the amount by which the actual production of such crop of wheat on the farm exceeds the normal production of the farm wheat-acreage allotment, if the producer establishes such actual production to the satisfaction of the Secretary. * * *"
7 U.S.C.A. § 1374—
"(a) The Secretary shall provide, through the county and local committees, for measuring farms on which corn, wheat, cotton, peanuts, or rice is produced and for ascertaining whether the acreage planted for any year to any such commodity is in excess of the farm acreage allotment for such commodity for the

The Act also provides for the publication, adjustment and review of quotas, including a court review if desired. 7 U.S.C.A. § 1374 directs that the Secretary provide, through county and local committees, for measuring farms on which wheat is produced, for ascertaining whether the acreage planted for any year to such commodity is in excess of the farm acreage allotment, and for a report to the State Committee in the event of such excess. Sec. 1375 directs the Secretary to prescribe such regulations to aid in discovering and identifying such amounts of wheat as are or are not subject to marketing restrictions, and such regulations as are necessary for enforcement. Sec. 1376 vests the several district courts of the United States with jurisdiction "specifically to enforce the provisions of this chapter" and provides for proceedings to collect the penalties provided in the chapter. It states: "The remedies and penalties provided for herein shall be in addition to, and not exclusive of, any of the remedies or penalties under existing law." Secs. 1374(a), 1375 and 1376 are set out in Note 1.

Proclamation of Quota and Referendum

Pursuant to the provisions of 7 U.S.C.A. §§ 1335 and 1336, the Secretary proclaimed a national marketing quota for wheat for the 1954 crop, and conducted a referendum. In the referendum 447,757 farmers voted, and of those 87.2% favored the quota for the marketing year beginning July 1, 1954. The Secretary published in the Federal Register, 18 F.R. 5707, a proclamation of the results of the referendum, stating that wheat marketing quotas would be in effect for the 1954–55 marketing year. Although it has no legal significance in this case, it is interesting to note that of the 1,734 Maryland farmers who voted, 86.7% voted "Yes". More than half, but less than two-thirds, of those who voted in Carroll County voted "Yes".

The Regulations

Pursuant to 7 U.S.C.A. § 1375, the Secretary issued and published in the Federal Register, 19 F.R. 202, regulations entitled "Wheat Marketing Quota for 1954 Crop", sec. 728.450, et seq., whose purpose was to "govern the identification and measurements of farms; the amount, adjustment, and review of the farm marketing quota and farm marketing excess; the issuance of marketing cards and certificates; the identification of marketings of wheat as subject to or not subject to the penalty and lien for the penalty; the rate of the penalty and the manner in which penalties shall be paid by producers and buyers; * * *."

Sec. 728.452 of the Regulations provided for the preparation and issuance of forms and instructions. Sec. 728.455 directed the county committees to provide for measuring each wheat farm in accordance with the procedure approved

farm under this chapter. If in the case of any farm the acreage planted to any such commodity on the farm is in excess of the farm acreage allotment for such commodity for the farm, the committee shall file with the State committee a written report stating the total acreage on the farm in cultivation and the acreage planted to such commodity."

7 U.S.C.A. § 1375—

"(a) The Secretary shall provide by regulations for the identification, wherever necessary, of corn, wheat, cotton, rice, peanuts, or tobacco so as to afford aid in discovering and identifying such amounts of the commodities as are subject to and such amounts thereof as are not subject to marketing restrictions in effect under this chapter.

"(b) The Secretary shall prescribe such regulations as are necessary for the enforcement of this chapter."

7 U.S.C.A. § 1376—

"The several district courts of the United States are vested with jurisdiction specifically to enforce the provisions of this chapter. If and when the Secretary shall so request, it shall be the duty of the several United States Attorneys in their respective districts, under the direction of the Attorney General, to institute proceedings to collect the penalties provided in this chapter. The remedies and penalties provided for herein shall be in addition to, and not exclusive of, any of the remedies or penalties under existing law."

by the Deputy Administrator. Sec. 728.458 defined the term "farm marketing quota" as applied to individual farms, and Sec. 728.459 provided for the determination of the farm marketing excess (a) where measurements are made, and (b) where measurements cannot be made. These sections of the Regulations are set out in Note 2.

There are numerous sections dealing with marketing cards and marketing certificates, penalties and exemptions. The sections dealing with records and reports include sec. 728.490 "Records to be Kept

2. Regulations

§ 728.451.—Definitions.

"(k) 'Operator' means the person who is in charge of the supervision and conduct of the farming operations on the entire farm.

"(l) 'Producer or farmer' means a person who as owner, landlord, tenant, or sharecropper is entitled to all or a share of the 1954 wheat crop or of the proceeds thereof."

§ 728.452.—Instructions and forms.

"The Director shall cause to be prepared and issued such forms as are necessary and shall cause to be prepared such instructions as are necessary for carrying out the regulations in this part. The forms and instructions shall be approved by, and the instructions shall be issued by, the Deputy Administrator for Production Adjustment Commodity Stabilization Service."

§ 728.455.—Measurements of farms.

"The county committee shall provide for measuring each wheat farm in the county in accordance with the procedure approved for use by the Deputy Administrator for Production Adjustment, Commodity Stabilization Service."

§ 728.458.—Farm marketing quota.

"The farm marketing quota for any farm for the 1954 crop of wheat shall be that number of bushels of wheat produced less the amount of the farm marketing excess for the farm."

§ 728.459.—Farm marketing excess.

"(a) Where measurements are made. * * *

"(b) Where measurements cannot be made. Whenever the determination of the wheat acreage in excess of the allotment for any farm is prevented by the producer, the farm marketing excess shall be the total number of bushels produced in 1954 on the farm. In the event the producer establishes, in accordance with § 728.461, the total number of bushels of wheat produced in 1954 on the farm, the farm marketing excess shall be the number of bushels of wheat produced in 1954 on the farm in excess of the normal production of the farm acreage allotment therefor."

§ 728.460.—Notice of farm marketing excess.

"Written notice of the farm marketing excess for a farm shall be mailed to the operator of each farm for which a farm marketing excess is determined. * * * Each notice shall be on a form prescribed by the Director and shall contain the information necessary in each case to inform the producer as to the basis for the determinations set forth in the notice and the effect thereof."

§ 728.490.—Records to be kept and reports to be made by producers.

"Each person who in 1954 harvests wheat which is subject to the provisions of these regulations shall, in conformity with section 373(b) of the act, keep the records and make the reports prescribed by this section, which the Secretary hereby finds to be necessary to enable him to carry out with respect to wheat the provisions of the act. The operator of the farm in connection with which a farm marketing excess is determined and in connection with which producers are ineligible to receive marketing cards or marketing certificates under § 728.466 or § 728.467 shall file with the treasurer of the county committee for the county in which the farm is situated a farm operator's report on MQ–98–Wheat (1954) showing for the farm the following information: (a) The total number of bushels of wheat produced thereon in 1954, * * * Upon the request of the county committee or county office manager the operator of any other farm shall make a similar report within 15 days after the request therefor is made."

§ 728.492.—Enforcement.

"It shall be the duty of the county committee to report or arrange for the county office manager to report in writing to the State committee forthwith each case of failure or refusal to make any report or keep any record as required by this sub-part and each case of making any false report or record. It shall be the duty of the State committee to report each such case in writing to the Director with a view to the institution of proceedings by the United States Attorney for the appropriate district, under the direction of the Attorney General of the United States, to enforce the provisions of Title III of the act."

and Reports to be Made by Producers" and sec. 728.492 "Enforcement". The latter section directs proceedings to enforce the provisions of the Act in each case of failure or refusal to make reports or keep records and each case of making any false report or record. Secs. 728.490 and 728.492 are set out in Note 2.

### The Instructions

Pursuant to Sec. 728.455 of the Regulations, the Deputy Administrator or his authorized assistant issued Instruction No. 1006 (Wheat '54)–1 headed "Procedure for Determination of 1954 Wheat Acreage" and five orders auxiliary thereto, and Instruction No. 1020 (Wheat '54) –2 "Pertaining to Wheat Marketing Quotas for the 1954 Crop of Wheat" and five orders auxiliary thereto, all stated to be for "Action by: All ASC State and County Committees."

These instructions were not published in the Federal Register or otherwise brought to the attention of defendants before suit.

The purpose of Instruction No. 1006 was to "outline the methods and procedure to be used in determining wheat acreage performance in connection with the 1954 wheat acreage allotment, marketing quota and price support program * * *". Sec. II deals with "Responsibilities of Committees and Farmers", including (A) State Committee, (B) County Office Manager, (C) Reporters, and (D) Farm Operators. Paragraphs C and D are set out in Note 3.

3.          Instructions No. 1006 (Wheat '54)–1.

  Sec. II C—

  "*Reporters*—Community committeemen shall be used as reporters wherever possible. Under the supervision of the county office manager, reporters will be responsible for field inspection and measurement on farms in designated areas. If any reporter is unable to measure the farms assigned to him within the time prescribed by the county office manager, another reporter will be employed to make the inspections and measurements."

  Sec. II D—

  "*Farm Operator*—The farm operator or his representative (whenever available) who is familiar with the farm will be responsible for assisting the reporter in making measurements, and for showing him all areas of the specified crops on the farm (all separate tracts constituting farm) on which measurements are required."

  Sec. IV—Farm Inspection and Measurements

  "A *General*—A reporter shall visit each farm for which a 1954 wheat acreage allotment was established and any other farm on which he has reason to believe there is an acreage planted to wheat for 1954 regardless of its intended use. Wherever this procedure provides for an 'estimate' of an acreage, such acreage may be measured if the reporter believes it inadvisable to make an estimate of the acreage."

  "C Extent of Measurements—When visiting the farm the reporter with the assistance of the farm operator or his representative, whenever available, shall:

  "2 In Counties approved for either 'wheat mixtures' or for 'green manure, cover crop or hay', or both:

  "a Measure the 'wheat acreage' on all farms on which the 'wheat acreage' is in excess of 15 acres.

  "b Measure the 'wheat acreage' on all farms for which a 1954 wheat allotment has been determined and the producer indicates he will apply for price support.

  "c Estimate the 'wheat acreage' for all farms with a wheat allotment on which the acreage seeded to wheat is obviously less than 15 acres if the producer indicates that he will not apply for price support.

  "d Estimate the 'wheat acreage' on all farms having allotments on which the acreage planted to wheat is more than 15 acres, the 'wheat acreage' is 15 acres or less, and the producer indicates that he will not apply for price support. In those cases coming under c and d above where the producer indicates that he will not apply for price support, the reporter shall make a notation on PMA–578 to the effect that 'No application will be made for price support on wheat.' The producer shall have his attention called to this statement at the time he signs Form PMA–578. If the producer decides at a later date to apply for price support and the 'wheat acreage' can still be determined, the 'wheat acreage' shall be measured at the producer's expense.

  "e Estimate the 'wheat acreage' on all farms not having allotments on which the

Section IV deals with "Farm Inspection and Measurements". Paragraph A directs what farms shall be visited; C deals with "Extent of Measurements", D

acreage planted to wheat is more than 15 acres and the 'wheat acreage' is less than 15."

Sec. IV E—Methods of Measurement

"1. Official Acreages—Acreages previously determined and recorded on the farm map—cut-out, aerial photograph, or other performance records, will be used when the entire field is planted to one crop and the field boundary has not been changed since the acreage was determined. Where the entire field is not planted to one crop, either portion of the field may be measured and its acreage subtracted from the recorded acreage."

"2 Aerial Photographs—Photographs will be used when available. Field and subdivision boundaries will be plotted in accordance with methods outlined in Instruction No. 1005-5 (Aerial photography and performance memorandum 28).

"3 Ground Measurement—Acreages shall be determined by ground measurements only where the use of photographs is not feasible. Ground measurements for row crops shall extend at least one-half the width of a row beyond the outside row.

Sec. VII—Finality in Measurements

"The acreages determined in the county office from measurements made in the field by the reporter will be considered final unless a redetermination is made by the State or county committee because (1) the State or county committee finds the report not acceptable, or (2) the redetermination is requested by the farm operator. * * *"

No. 1006 (Wheat '54)–1 AUX.–3.

"In any case where a producer refuses to permit the reporter to measure or estimate his wheat acreage or refuses to give the reporter information necessary to complete his report (location of fields, estimate of planted acreage, etc.) all information available to the reporter shall be entered on the report and a statement with respect to the producer's refusal written in Section II of PMA–578 and the report signed by the reporter. It is important that such cases be well documented in order that as much information as possible will be available to the county and State committees in the event of later controversy.

"When the PMA–578 is returned to the county office with such notations, past wheat history as shown on county office records, crop insurance acreage reports, information obtained from neighbors, assessor's records, and any other information available should be used in establishing a fair estimate of the planted acreage and the source of the information noted on the report.

"If a producer refuses to permit the reporter to measure his wheat acreage, but will permit the reporter to estimate the acreage by *visual* inspection, the estimated acreage shall be entered on the report in the manner prescribed by these instructions, a notation that the producer refused to permit measurements entered in Section II of the report and the PMA–578 signed by the reporter.

"Any case where the farmer refuses to permit the reporter to measure the wheat acreage shall be reported to the State office. A member of the State committee or their representative should contact the farmer in an effort to clear up any misunderstanding and, if possible, measure the wheat acreage.

"Marketing quota regulations and instructions provide that the entire production from any farm on which the producer does not permit a proper determination of acreage shall be considered as excess production subject to penalty and lien for penalty until a determination can be made with respect to the acreage of wheat planted on the farm and the amount of any farm marketing excess. Therefore, if measurements cannot be obtained from either the county or State level, it will be necessary to follow the procedure set forth in Section V E, page 7 and Section XIII, page 20 of Instruction No. 1020 (Wheat '54)–2."

No. 1020 (Wheat '54)–2

Sec. V—Notice of Farm Marketing Quotas and Farm Marketing Excess.

"E Notice with respect to Farms for which Measurements cannot be Made.— Where a producer refuses to permit measurements on any farm, a letter shall be mailed to the operator of such farm including the following information: (1) The State and county code and farm serial number, (2) the 1954 wheat acreage allotment, (3) the normal yield, (4) that the amount of the farm marketing excess is the amount of wheat produced in 1954 on the farm until measurements can be made, and (5) that the operator's farm will be measured if he will give his consent in order that a determination may be made as to whether there is excess wheat. If the producer fails to permit measurement within the 60-day period, MQ–90–Wheat (1954) shall be forwarded to him requiring him to show the

with "Equipment" and E with "Methods of Measurement." The important parts of these paragraphs are set out in Note 3. The reporter is instructed to make estimates in certain cases, to use maps and aerial photographs, and to determine the acreage "by ground measurement only when the use of photographs is not feasible." Identification of fields and measurement on maps is contemplated as the normal procedure.

Sec. VII deals with "Finality in Measurements", and provides that "the acreages determined in the county office from measurements made in the field by the reporter will be considered final unless" the State or county committee or the farm operator wishes a redetermination. The word "measurement" is used in two senses, sometimes meaning ground measurement by the use of equipment supplied to the reporters, and sometimes in the more general sense, meaning measurement by any of the methods provided for in the instructions.

Auxiliary 3 to No. 1006, set out in full in Note 3, deals with what shall be done where a producer refuses to permit the reporter to measure or estimate his wheat acreage or refuses to give the reporter information necessary to complete his report. It refers to procedures set out in Instruction No. 1020.

The purpose of Instruction No. 1020 was to "outline the procedure and methods to be employed by the county committees under regulations issued by the Secretary in determining and handling farm marketing quotas and farm marketing excess." After a long series of definitions and a section on forms and their uses, Sec. V deals with "Notice of Farm Marketing Quotas and Farm Marketing Excess". Paragraph E of this Section covers "Notice with Respect to Farms for Which Measurements Cannot be Made", and is set out in Note 3. After other sections dealing with wheat marketing cards, adjustment in farm marketing excess, review, etc., Sec. XIII provides that any producer who has not disposed of his excess wheat or has not paid the penalty thereon within sixty days after the normal date when harvest is substantially completed in the county shall be requested to complete and submit form MQ–98 showing the disposition made of all wheat produced on the farm in 1954. It continues: "It is expected that the county committee will make every reasonable effort to dispose of these cases at the county level", but if this cannot be done the county committee shall notify the State committee, giving all available information, and the State committee shall take such further action as it deems appropriate. If the

disposition made of all wheat produced on the farm."

Sec. XIII—Failure of Producers to Dispose of Excess Wheat.

"Any producer who has not disposed of the excess wheat determined for any farm in which he has an interest in the wheat crop in the county for 1954 or has not paid the penalty thereon, as provided in these instructions, within 60 days after the date the State committee established as the normal date when harvest is substantially completed in the county, shall be requested to complete and submit Form MQ–98 showing the disposition made of all wheat produced on the farm in 1954. It is expected that the county committee will make every reasonable effort to dispose of these cases at the county level. However, if the producer refuses to dispose of the excess or to pay the penalty thereon, the county committee shall so notify the State committee. The notice should set forth all available information pertinent to the case, including the steps taken by the county committee (letters, personal contracts, dates thereof, etc.) in attempting to conclude the case. The State committee shall upon receipt of the notice take such further action as it deems appropriate.

"Any case which the State committee cannot conclude after making all reasonable efforts shall be fully documented and forwarded to the Director, Grain Division, CSS, with a view to instituting proceedings under Title III of the Act.

"When producers have failed to dispose of their excess wheat in accordance with these instructions, any payments due the producer from any other program administered by the county committee shall be withheld until proper disposition has been made of the farm marketing excess."

State committee cannot conclude the case, they shall forward it to the Director, Grain Division, CSS, "with a view to instituting proceedings under Title III of the Act." Sec. XIII is set out in Note 3.

## Facts

Each of the 9 complaints, as amended, alleges that defendant in 1954 was a producer of wheat on a farm operated by him in Carroll County, Maryland, identified on the records of the Carroll County Committee by a certain serial number, and that there was established for said farm a wheat acreage allotment, of which defendant was duly notified by mail. All defendants admitted these allegations. The respective wheat acreage allotments alleged and admitted were: Case No. 7692, H. Paul Morelock, 19 acres; No. 7693, Ray Haines, 28 acres; No. 7694, Lawrence Haines, 20 acres; No. 7695, Lawrence H. Haines, Jr., two farms, 19 acres and 17 acres, respectively; No. 7696, Rodney G. Haines, two farms, 4 acres and 13 acres, respectively; No. 7697, Herbert A. Hull, 10 acres; No. 7699, Paul S. Sterner, 10 acres; No. 7700, Lindsay B. Shafer, Lewis Shafer, and Joseph Shafer, individually and as co-partners doing business as Shafer Bros., and Shafer Bros., a partnership, 32 acres; No. 7701, Lewis Shafer, 24 acres.

Each complaint also alleges that a representative of the county committee called at defendant's farm on or about stated dates in April and May, 1954, for the purpose of measuring defendant's 1954 wheat acreage and for the purpose of ascertaining "whether the acreage seeded to wheat on said farm was in excess of 15 acres or the wheat acreage allotment established for the farm. Said representative requested defendant's permission to enter on the farm for the purpose of making such measurement and defendant's identification of the wheat acreage on said farm. Defendant refused to permit such entry on the farm for the measurement of said wheat acreage, or to identify the wheat acreage thereon." Five of the answers admit such refusal. Three answers allege that the purported representative requested permission to enter upon the farm by saying "You know why I am here", to which defendant replied "You know how I feel about it", and thereupon the purported representative departed. One answer alleges that after a conversation with defendant's son, the representative departed and did not return.

None of the defendants took the stand, but counsel for all of them stated in open court that all of them now refuse to permit the county committee or its representative to enter on their respective farms for the purpose of measuring the 1954 wheat acreage.

Although there are differences in the evidence in the several cases, I find as a fact that all of the defendants refused in the Spring of 1954 to permit the reporter to enter on their respective farms, for the purpose of making a measurement of the wheat acreage, and refused to identify the wheat acreage to the reporter, whom I find in each case to have been a duly qualified reporter within the meaning of Instruction No. 1006. The subsequent action or lack of action on the part of the administrative agency is set out and discussed in Section II of this opinion.

Each of the complaints alleges that "unless such measurement is obtained forthwith the best available evidence of such wheat acreage may be destroyed by plowing." Defendants denied this allegation, and no evidence in connection therewith was offered, but it was agreed by counsel for all parties at a preliminary hearing that it would be possible for several months to tell from an examination of the ground what acreage had been planted to wheat.

Each of the answers alleged that the defendant is not the owner or the sole owner of the farm in question. No evidence on this point was introduced by any party in any of the cases. Therefore, I am unable to make any finding with respect to ownership of the various farms, but I do find as a fact that all defendants were operators of their re-

spective farms and producers of wheat on their respective farms within the meaning of the Act and the Regulations.

No evidence was offered by either side with respect to the number of acres of wheat actually planted or harvested by any of the defendants for the 1954 crop, except in the case of Morelock, No. 7692, where the government offered in evidence a letter containing an affidavit by Morelock that he had planted only 14 acres of wheat for the 1954 crop. I find as a fact, therefore, that Morelock planted less than 15 acres of wheat for harvest in 1954.

The government offered no evidence except the various allotments, which were based on the average plantings during past years, from which any inference as to the amount of wheat planted on any of the other farms for harvest in 1954 could be drawn. The defendants offered no evidence at all on this point. There is no evidence that any defendant indicated he would apply for price support. There is affirmative evidence from the reporter's original report on Form PMA–578 that most defendants indicated the contrary.

Each answer raised 14 separate defenses, and Morelock's answer added one based on his claim that he had planted less than 15 acres. Counsel for defendants moved to strike out all of the testimony of every witness, to strike out all but one of the exhibits, and to dismiss the complaints, citing a great variety of grounds.

Some of the points are frivolous; some were cured by amendments of the complaints during the trial; some are fully answered by Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122. But there is a residuum which must be seriously considered and which may be conveniently grouped under two headings: I. Constitutional Points, and II. Procedural Points.

### I. Constitutional Points

■ The claim that the relief prayed would violate the Fourth Amendment is entirely without merit. "As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl.Comm. 223, 225, 226." Hester v. U. S., 265 U.S. 57, at page 59, 44 S.Ct. 445, at page 446, 68 L.Ed. 898.

■ Nor is any violation of the Tenth Amendment involved. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; Rodgers v. U. S., 6 Cir., 138 F.2d 992.

■ Defendants contend that the proposed action would violate the Fifth Amendment for several reasons: (a) that it would deprive them of liberty and property without due process of law; (b) that it would take their property for public use without just compensation; and (c) that it would compel them to be witnesses against themselves in a criminal case. Points (a) and (b) are answered by Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122. Point (c) requires more extended discussion.

The government has requested two injunctions (1) restraining interference with entry on the farms by the county committee or its representatives, and (2) affirmative action by the defendants to identify the fields planted to wheat, etc. The proposed injunction restraining interference with the entry on the farms would not compel defendants to give evidence against themselves. Hester v. U. S., 265 U.S. 57, at pages 58–59, 44 S.Ct. 445, 68 L.Ed. 898.

The proposed injunction requiring defendants to identify the fields or to take other affirmative action to aid the reporters presents a more difficult question. Defendants cite and rely upon Boyd v. U. S., 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. The present status of Boyd in the Supreme Court is not free from doubt in view of the discussions of that case in the majority opinion and notes of Chief Justice Vinson in Shapiro v. U. S., 335 U.S. 1, at pages 33, 34, 68 S.Ct. 1375, at

pages 1392, 1393, 92 L.Ed. 1787, and in the dissenting opinion and notes of Mr. Justice Frankfurter in the same case, 335 U.S. at pages 58, 67–69, 68 S.Ct. at pages 1404, 1408–1410. These two opinions discuss at length many other cases on this point. Such a discussion presupposes that the proceedings and penalties involved are criminal proceedings and penalties. In Usher v. U. S., 146 F. 2d 369, 371, the Fourth Circuit Court of Appeals held the action to enforce a penalty under the Agricultural Adjustment Act of 1938 "to be a civil one and not criminal and that it was only necessary for the plaintiff to prove its case by a preponderance of the evidence rather than beyond a reasonable doubt."

But in Rodgers v. U. S., 332 U.S. 371, 68 S.Ct. 5, 7, 92 L.Ed. 3, the Supreme Court held that the penalties under said Act are "analogous to those of the criminal law", and do not bear interest from the date of incurring the penalty to the date of judgment. In an earlier appeal in the Rodgers case, 138 F.2d 992 (not the decision which the Supreme Court reversed in 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3) the Sixth Circuit held that the constitutional privilege against self-incrimination did not protect the defendant from being required to submit the records and reports required by the statute. The decision of the Court of Appeals in the earlier Rodgers case was cited with apparent approval by the Supreme Court in the later Rodgers case. 332 U.S. at page 376, 68 S.Ct. at page 8.

But in view of my decision under II A below that the proposed injunction requiring defendants to identify the fields on which wheat had been grown must be denied, it is not necessary in this case to decide whether such an injunction would require defendants to be witnesses against themselves in a criminal case within the prohibition of the Fifth Amendment, and I intimate no opinion on that question.

Defendants say that they do not intend to sell any of the wheat they have grown; that any possible effect on interstate commerce of their consumption of their home-grown wheat is minimal; that they will not accept any benefits under the Act; and, therefore, that their activities do not come within the scope of the Commerce Clause of the Constitution, Article 1, sec. 8, clause 3. This point, however, is fully answered by Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

■ Defendants' counsel invoked the "embattled farmers" who stood "by the rude bridge that arched the flood" at Concord. But the rude bridge is rude no longer; it has been replaced by a more elaborate structure. Our government now involves an enormous number of reciprocal benefits and restrictions. Most farmers accept the restrictions involved in this Act in order to enjoy its benefits, Hawthorne v. Fisher, D.C., 33 F.Supp. 891, although some farmers receive little or no benefit, Wickard v. Filburn, supra. But the wisdom of the Act is a question to be decided by the Congress, in which these embattled farmers are represented.

## II.  Procedural Points

7 U.S.C.A. § 1376 vests the district courts with jurisdiction "specifically to enforce the provisions of this chapter", provides for proceedings to collect the penalties provided in said chapter and provides for the preservation of remedies under existing law.

This statute has been interpreted to justify an action for damages, Usher v. U. S., 4 Cir., 146 F.2d 369; Rodgers v. U. S., 6 Cir., 138 F.2d 992; U. S. v. Biehunko, D.C.S.D.Tex., 55 F.Supp. 706; U. S. v. Locke, D.C.M.D.Tenn., 56 F. Supp. 999, and a judgment which mandatorily required defendant to furnish certain reports pursuant to the act and regulations, Rodgers v. U. S., supra, U. S. v. Locke, supra. But see Rodgers v. U. S., 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3, discussed above. And cf. U. S. v. Biehunko, supra, which dealt with reports due in the future.

Under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, 7 U.S.C.A. § 608a(6), the courts are vest-

944

ed with jurisdiction "specifically to enforce, and to prevent and restrain any person from violating any order, regulation or agreement, heretofore or hereafter made or issued pursuant to * * * this title, in any proceeding now pending or hereafter brought in said courts." That language has been held to authorize a mandatory injunction commanding compliance with Milk Order 41, a general order, by payment of the sums alleged to be due to a "Producer-settlement Fund", U. S. v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 208, 91 L.Ed. 290; U. S. v. Turner Dairy Co., 7 Cir., 162 F.2d 425, certiorari denied 332 U.S. 836, 68 S.Ct. 219, 92 L.Ed. 409, and an injunction requiring defendant to file reports and make available to the administrator books, memoranda, accounts and records dealing with the (past) period involved in the case. U. S. v. Turner Dairy Co., supra.

No cases have been cited or found where provisions similar to those in sec. 1376 have been held to authorize an injunction to permit discovery apart from an action to enforce penalties.

The government is asking for two injunctions in each of these cases: one to require defendants to identify the wheat acreage to the reporters, and the other to restrain defendants from interfering with the entry of reporters on their farms in order to measure the wheat acreage.

■■ A. Defendants had no duty to aid the reporters to measure the wheat acreage on their respective farms, imposed on them by any statute or by any valid rule or regulation binding on them. The Act itself, 7 U.S.C.A. § 1373, called for the reports which were required in the Rodgers and Locke cases, supra. But there is no provision in the Act or the Regulations imposing any duty on farm operators in connection with the visits of the reporters or other representatives of the county committee. The only obligation on farm operators in that connection is set out in Paragraph II D of Instruction No. 1006 (see Note 3). This Instruction was not published in the

Federal Register or otherwise brought to the attention of defendants before suit. It was, therefore, not binding on them. 5 U.S.C.A. § 1002, 44 U.S.C.A. §§ 305, 307. Moreover, the government has not shown that any identification of the fields or other affirmative action by defendants is necessary to the enforcement of the Act. It follows that no injunction should be issued to require defendants to assist the reporter in making measurements or to show him the areas planted to wheat on their respective farms.

B. The prayer for an injunction to restrain defendants from interfering with the entry of the county committee or its representatives on their respective farms raises a number of questions. The government contends that such an injunction (1) is provided for by the Act and the Regulations, so that an injunction prohibiting interference with such entry would be a specific enforcement of the provisions of the Act, and (2) apart from the provisions of the Act and the Regulations, is authorized under the general equity jurisdiction of this court in aid of the enforcement of the Act.

1. Sec. 1374 of the Act directs the Secretary to "provide, through the county and local committees, for measuring farms on which * * * wheat * * * is produced and for ascertaining whether the acreage planted for any year to any such commodity is in excess of the farm acreage allotment for such commodity for the farm * * *," and calls for a report of such excess acreage to the State committee.

Sec. 728.455 of the Regulations directs the county committee "to provide for measuring each wheat farm in the county in accordance with the procedure approved for use by the Deputy Administrator."

Sec. 728.459(b) provides for the determination of the farm marketing excess "whenever the determination of the wheat acreage in excess of the allotment for any farm is prevented by the producer" (see Note 2).

Instructions 1006 and 1020 set out the procedure referred to in Sec. 728.455 (see Facts and Note 3). As we have seen, those Instructions were not published in the Federal Register, and therefore cannot impose any affirmative duty on defendants.

The Instructions make no reference to any injunction or other court action in aid of obtaining measurement of the wheat acreage. Sec. 728.456 of the Regulations calls for certain reports, and sec. 728.492 calls for court action where reports are not filed. Not only is there no similar provision for court action in aid of measurement in either the Regulations or the Instructions, but sec. 728.459(b) of the Regulations, Paragraph IV E of Instruction 1006 and Auxiliary 3 to Instruction 1006 contemplate the determination of the farm marketing excess at the county committee level by various means where measurement has been refused by the farmer.

The farmer can have a proper adjustment made in the excess as so determined. Sec. 728.459(b), .460 and .461 of the Regulations. But until so adjusted, the excess, determined as above provided, may be made the basis for an action to collect the penalties, provided for by 7 U.S.C.A. § 1376, as well as by the Regulations and Instructions. See e. g. U. S. v. Locke, supra.

The Regulations also provide that such excess may be made the basis for the denial of a marketing card to the farmer, thus preventing him from selling his wheat free of lien until he complies with the Act.

Instruction 1020 provides for action by the county and State committees, which will be discussed below.

In view of these Regulations and Instructions, I find that there is no "provision" in the Act or Regulations for entry on the farm at this time which the court may "specifically * * * enforce" under sec. 1376.

It follows that this suit must be considered a proceeding to secure one of the remedies under existing law, referred to in said section, and governed by ordinary equitable principles.

Even if I found that such entry was a "provision" of the Act to be "specifically enforced" under sec. 1376, I would still have to be guided by general equitable principles in deciding whether to issue the requested injunction.

"* * * A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made.

"* * * 'An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity.' Meredith v. City of Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11, [88 L.Ed. 9]." Hecht Co. v. Bowles, 321 U.S. 321, at page 329, 64 S.Ct. 587, 591, 88 L.Ed. 754.

2. Defendants contend that the requested injunction prohibiting interference with entry on the farms at this time is not justified by general equitable principles, and should be denied (a) because the government did not follow its own prescribed procedures, and (b) because it has an adequate remedy at law.

a. The Regulations contemplate an original entry on the land by the reporter to measure the wheat acreage. If such measurement is permitted, sec. 728.459 (a) applies. If it is refused, sec. 728.459 (b) and the other provisions of the Regulations and Instructions discussed in point II A 1 above, and set out in Notes 2 and 3, apply. These provisions call for action by the reporter, action by the county committee and action by the State committee.

The original report of 1954 wheat acreage (Form PMA–578), signed by the reporter and offered in evidence in each case, did not contain (1) an estimate of

planted acreage, nor (2) all information available to him, as required by the first paragraph of Aux. 3 to Instruction No. 1006.

The county committee did send to each farmer during April or May a letter (set out in Note 4) as required by paragraph V E of Instruction No. 1020. But that letter misstated the law with respect to the calculation of the farm marketing excess and of the penalty, basing them on the allotment, rather than on the actual production, as required by Regulation 728.459(b).

The county committee made no estimate of the planted acreage, as required by paragraph 2 of Aux. 3 to Instruction No. 1006.

The county committee did send to each defendant a notice of farm marketing excess, Form MQ–93, required by Reg. sec. 728.460, but the notice did not conform with the Regulation. It contained no figure for "acreage of wheat" (Box 1), but based the "excess acreage of wheat" (Box 3) on the "farm wheat acreage allotment" (Box 2), and, therefore, came up with an erroneous "farm marketing excess of wheat" (Box 7). It should have set out in Box 1 a figure for "acreage of wheat" based on an estimate made pursuant to the Instructions discussed above, and used that figure as the "excess acreage of wheat" in Box 3; it should then have computed the "total number of bushels produced" and entered that figure as the "farm marketing excess," pursuant to Reg. sec. 728.459(b). The notice called on defendant to remit to the county committee the penalty on the farm marketing excess, so erroneously calculated, or to deliver it in the manner specified not later than September 1, 1954. The committee also sent each defendant Form MQ–98 "Wheat Record and Report Made by Farm Operator", as called for by Reg. sec. 728.490. None of the defendants completed this form. But there is no request in this case for an order requiring that this form or any other report be filed by any of the defendants.

There is no evidence that the county committee made any other effort to dispose of any of the cases except the Morelock case, where there were some further correspondence and conversations with Morelock's attorney. In all cases except the Morelock case, I find as a fact that the county committee did not make the reasonable effort to dispose of the cases at the county level required by Aux. 3 to Instruction No. 1006 and Paragraph XIII of Instruction No. 1020.

Nor is there any evidence that the State committee made any effort to conclude the cases.

Restatement, Torts, Section 211, p. 529, states:

"A duty or authority imposed or created by legislative enactment carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled."

4. Letter from Wm. A. Myers, Chairman, ASC Committee of Carroll County, to each Defendant, sent during April and May, 1954.

"Our records indicate that the reporter visiting your farm for the purpose of measuring your 1954 wheat acreage under the Wheat Marketing Quota Program was not permitted to make the necessary measurements.

"Under the marketing quota law we are required to establish a normal yield for your farm, which when multiplied by your 1954 wheat acreage allotment, establishes the amount of the farm marketing excess of wheat produced on the farm until such time as you permit our reporter to make these measurements.

"It will be appreciated if you will notify us that such measurements can be made on your farm within the next 30 days; otherwise, you will be subject to a lien in the amount of the penalty on the total wheat acreage *alloted* to your farm.

"In the event you are not satisfied with the measured acreage, you have the right to appeal to the County Committee or direct to the Marketing Quota Review Committee established by the Secretary of Agriculture."

Comment j to said section is as follows:

"In order that the actor may avail himself of the statutory privilege, it is necessary that all the provisions of the statute, ordinance or order by way of condition precedent to entry on his part, shall have been complied with in so far as such conditions have a bearing on his privilege to enter the land."

In 26 Comp.Dec. 99, dated August 5, 1919, the Comptroller of the Treasury stated (p. 104):

"It has been suggested that the requirements of the regulations be waived in this particular case, but it has been held that regulations made pursuant to or in the execution of a particular statute, as these regulations were, become a part of the law and of as binding force as if incorporated in the body of the act itself. United States v. Barrows, 1 Abb. 351, 24 Fed.Cas. [page] 1018 [No. 14,529]. They may be modified, repealed or created anew by the same authority that made them (United States v. Eliason, 16 Pet. 291, 302 [10 L.Ed. 968]), but until this is done they are binding as well on the authority that made them as on others."

In 21 Comp.Dec. 482, he said:

"The distinction should be made between essential regulations made in aid of a statute, such as are necessary to the execution of the statute and thus have the appearance of being of a decidedly legislative character and regulations which are merely supplemental to these and relate to the minor details of the machinery for the execution of the statute. These latter are made in aid of the statute also, but are not of the character referred to and may more properly be termed administrative and directory. The line of demarcation may not be easily defined but there is a clear distinction between the two classes of regulation."

At first blush it might seem that Instructions 1006 and 1020 are administrative in character, but 7 U.S.C.A. § 1375, directing the Secretary to provide through county committees for measuring farms, and Reg. sec. 728.455, directing the county committee to provide for measuring farms "in accordance with the procedure approved for use by the Deputy Administrator", indicate clearly that the Instructions were intended to be something more than purely administrative regulations.

If this were a case where defendants were trying to restrain the government from attempting to enforce penalties imposed pursuant to the Regulations, the failure of defendants to exhaust their administrative remedies probably would be a bar to their attack on the regulation.

I have found no case where this rule has been applied against administrative agencies, although there are cases where an administrative hearing was held to have been improper because the agency did not follow its own rules. E. g. Sibray v. U. S., 3 Cir., 282 F. 795, United States ex rel. Ohm v. Perkins, 2 Cir., 79 F.2d 533. In some but not all of these cases it was indicated that prejudice would have to be shown. In our case it is impossible to tell from the evidence what the county committee would have found if they had followed the Instructions, and whether any penalties or other sanctions would have been warranted. In any event, it is hardly equitable for an agency to ignore the procedures set up by its own regulations and instructions, and then ask a court of equity to enjoin defendants from interfering with action which might not have been necessary if the regulations and instructions had been followed.

Moreover, it does not appear that a measurement by visual inspection of the wheat acreage of the various farms could not have been made by reasonable diligence on the part of the county committee. I do not think the government is required to make aerial photographs from such a low height that they will show whether the field is planted in wheat or some other grain. But it does not appear that the reporters, who were

948

teachers in the Carroll County schools and part-time farmers, made much of an effort to persuade defendants to permit a visual inspection of the farms, so that the reporters could note the fields planted to wheat on the maps of the farms which they had with them, and which showed the area of each field. The witness Caltrider, who was the reporter in a number of the cases, testified that "with the maturing of the crop you could stand at a distance and tell whether it was rye or barley or wheat, but in the spring I don't think you could make a determination very exactly unless you inspected the field at close range." It does not appear that the reporter or any representative of the state or county committees made any effort to make a visual inspection or estimate after the crop had matured.

b. The government contends that it is impossible, or impracticable, to follow the prescribed regulations and instructions and that without entry on the farms an accurate measurement cannot be made. But the Act and the Regulations do not require an accurate measurement when measurement is prevented by the producer. Reg. sec. 728.459(b). An estimate of production may be made, and the farm marketing excess based on such estimate. The Act and the Regulations further provide for an adjustment in the amount of the farm marketing excess and the penalty at the request of the farmer and a procedure to protect his rights. 7 U.S.C.A. §§ 1340, 1372, Reg. secs. 728.460 and 728.461. "In the consideration of any application for an adjustment in the farm marketing excess, the producer shall have the burden of proof." Reg. sec. 728.461(b). Adjusted or unadjusted, the farm marketing excess, so determined, may be made the basis for an action to collect the penalties. 7 U.S.C.A. § 1376, and Regulations, supra. Entry at this time, which the court is asked to require, is not necessary for the enforcement of the Act.

From all of the foregoing discussion, it appears that the government has an adequate remedy at law to enforce the penalties provided by the Act and the Regulations. That is the method which was followed by the government in the Usher, Rodgers, Locke and Biehunko cases, supra. In such an action, the government could obtain discovery under Fed. Rules Civ.Proc. Rules 26 to 37, 28 U.S.C.A. Rule 34 authorizes the court to "order any party to permit entry upon designated land or other property in his possession or control for the purpose of inspecting, measuring, surveying, or photographing the property or any designated object or operation thereon within the scope of the examination permitted by Rule 26(b)." It is possible, but not certain, that the government might obtain the same relief by a petition under Rule 27 in advance of suit.

The government argues that if it has proved facts which would support a petition under Rule 27 and an order of the character provided for by Rule 34, the court has power to grant such relief in this case even though it was not requested in the government's pleadings. Rules 1, 8, 15(b) and 54(c). But Rules 27 and 34 could only be invoked in aid of a proceeding to enforce some right under the Act. The government has not made any claim for a penalty or for other relief in aid of which Rule 34 could properly be invoked, nor asked that the testimony of anyone be preserved under Rule 27, in connection with which an inspection of the character provided for under Rule 34 could be ordered at this time. If the government wishes to proceed along this line, it should file a proper petition under Rule 27 or file a new action and proceed under Rule 34.

■ The old equitable proceeding of a bill for discovery in aid of an action at law has been superseded by the Rules. This is not to say that a district court is entirely without general equitable powers to aid the enforcement of the Act. "Since public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." Porter v. Warner Holding Co., 328 U.S. 395, at page 398, 66 S.Ct. 1086, at page 1089, 90 L.Ed. 1332. See also Hecht Co. v.

Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754; Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789. But a grant of jurisdiction to issue an injunction or other order to insure compliance with the orders of an administrative agency was held in Hecht Co. v. Bowles, supra, not to impose an absolute duty to do so under any and all circumstances, but simply authority to do so if such an injunction is justified under broad equitable principles. Under all the circumstances in this case, I do not find that the government is entitled to the equitable relief requested.

The Secretary of Agriculture is not a necessary party plaintiff to these suits. The reasons which required the joinder of the Secretary as a party defendant in Hawthorne v. Fisher, supra, do not apply here. The Secretary was not a party in the Usher, Rodgers, Locke and Biehunko cases, all of which were brought in the name of the United States.

All motions to strike evidence are overruled. All exhibits marked for identification are admitted in evidence.

I will sign orders dismissing the complaints.