**UNITED STATES v. WEST TEXAS
COTTONOIL CO.**

No. 11533.

Circuit Court of Appeals, Fifth Circuit.

May 21, 1946.

Rehearing Denied July 12, 1946.

Mary Connor Myers, Atty., Office of Solicitor, Department of Agriculture, of Washington, D. C., Brian S. Odem, U. S. Atty., and James K. Smith, Asst. U. S. Atty., both of Houston, Tex., for appellant.

John C. White and Milton K. Eckert, both of Washington, D. C., and Earl G. Stearns, of Houston, Tex., for appellee.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was for marketing penalties imposed by the Agricultural Adjustment Act of 1938[1] in respect of excess cotton disposed of in 1939 to the Government of France. The defenses were (1) that the cotton was not marketed but was requisitioned and hence was not subject to penalty; (2) that if it was marketed, the marketing took place in a foreign country outside of the jurisdiction of the United States and beyond the reach of its laws, and, therefore, was not subject to penalty.

The district judge, agreeing with the first defense that the cotton was not marketed within the meaning of the statute, gave judgment for the defendant on that ground.

Appealing on an agreed statement,[2] the United States is here insisting that the judgment was wrong and must be reversed. We agree.

While the cotton was in form requisitioned by the French Government, it was in fact bought by it under arrangements by which that government established a buying monopoly, not only as to cotton then on hand but as to cotton later imported. What occurred was not an involuntary sale under process where a person unwilling to sell was forced to do so. There was merely a complete mobilization for war of the resources of France and the heading up into one buyer of the many buyers theretofore available. In the same way afterwards in this country the United States became the greatest of single buyers. The fact that the price was initially set by GIRC and that it used the power of government to bring the cotton out for sale in no sense changed the controlling fact that the sale was for a price agreed to and accepted by the seller, and that in substance the transaction represents a voluntary transfer for a price agreed upon and not an involuntary and compelled one.

---

[1] Act, Sec. 348, 7 U.S.C.A. § 1348.

[2] Defendant is a corporate subsidiary of Anderson-Clayton & Co., hereafter called "Clayton", of Houston, Texas, which has an office at Le Havre, France. During the year 1938, defendant produced excess cotton on its Lockview Farm in Floyd County, Texas, part of which was marketed in the U. S. and the penalties paid. This suit is concerned with 307 bales of the excess which defendant shipped from Houston, Texas, consigned to Le Havre for the account of defendant, and discharged there and placed in warehouses prior to Sept. 2, 1939. On Sept. 2, 1939, Clayton was notified by GIRC, the agency through which the French Government took charge of and handled the acquisition by it of cotton, that all cotton in the warehouses in France, which, of course, included defendant's cotton, was requisitioned by the Government under the law of July 11, 1938. Defendant's cotton was not, however, physically taken into possession by GIRC, but under an agreement with GIRC was handled for it by Clayton. Acting under instructions of GIRC, Clayton made delivery of the cotton. Clayton did complain to GIRC that the price fixed was too low since it was lower than that fixed after the war started, but it did not take any proceedings in the court of requisition as it was advised it could do. For reasons satisfactory to it, it accepted the basic price offered it, and at all times its relations were, and continued to be, most friendly with GIRC, in fact Clayton became an agent for GIRC for the importation of additional cotton. As to the price received, defendant's president in transmitting vouchers for the cotton, said that he thought the price received represented a very fair price. In addition to the price paid it by the French government, defendant, under an offer of the Secretary of Agriculture to subsidize export cotton, received from the United States Government $2420.20 on the same cotton.

If, however, we could agree with appellee that the sale was a forced one, was involuntary and not voluntary, we could not agree that it would fall outside of the statute. The language of the statute is very broad. As originally enacted, it declared: "'Market' * * * means to dispose of by sale, barter, or exchange," 7 U.S.C.A. § 1301(b) (6) (A). Blackstone defines a sale to be "a transmutation of property from one man to another in consideration of some price", 2 Blackstone, 246. "A sale in the ordinary sense of the word is a transfer of property for a fixed price in money or its equivalent." Five Per Cent Cases (State of Iowa v. McFarland), 110 U.S. 471, at page 478, 4 S.Ct. 210, 28 L.Ed. 198, 200. A sale is no less a sale because it is made pursuant to a requisition.[3] In issuing regulations pursuant to the authority granted in the Act, the Secretary of Agriculture defined "sale" as meaning "any transfer of title to cotton by a producer to another by any means other than barter or exchange."[4] The 1940 Amendment of the Act did not, except by adding gifts, change, it merely clarified, the meaning of the word "market" as used in the original act. As amended, the definition reads: "'Market' in the case of * * * cotton * * * means to dispose of, in raw or processed form, by voluntary or involuntary sale, barter, or exchange, or by gift inter vivos."[5] The report of the Senate Committee explaining the amendatory legislation shows that what was in question was not whether the act covered cotton sold to governments but whether "the term market as now used applies to a judicial or involuntary sale." Further, as appears from the report of the committee, the amendatory legislation was not, except by adding the words "gift inter vivos," intended to change or add to the original meaning. The intent was merely to more clearly declare it. The Secretary of Agriculture so understood the amendment and in subsequent regulations the only change he made in his definition of the word "sale" was to add the words "or by gift inter vivos."

Appellant's second defense that the sale took place in France and therefore beyond the reach of the marketing law entirely misapprehends the nature and effect of the law. It subjects the owner of the cotton to the penalty when the cotton is sold by it. Here the cotton was voluntarily sent abroad by the defendant to be sold. The price offered by the French Government was accepted and received by it here, and in addition defendant accepted and received from the United States an export subsidy on the same cotton. It is fantastic to say that the imposition of the penalty in this case gives extra territorial effect to the law. The penalty is not imposed in France, it is imposed in the United States on the owner of the cotton, a domestic corporation, which voluntarily sent its cotton abroad to be sold, and voluntarily here accepted and received the price for which it was sold. American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047, as its facts show, was an entirely different case from this. Indeed, the reasoning of the opinion makes it clear that the penalty here imposed falls in the United States on the seller here and is collectible.

Appellee presents a third defense, that the penalty as to the cotton in question constitutes a burden or duty laid upon exports in violation of the provisions of Art. 1, Sec. 9, Clause 5 of the Constitution, that "No Tax or Duty shall be laid on Articles exported from any State." If appellee were right in its claim that the penalty is a tax or duty on exportation, it would, of course, be right in its claim that such penalty cannot be laid. But upon no reasonable view can it be claimed that the excess cotton penalty is a tax on exportation. A penalty imposed on the marketing of excess cotton, it has for its object not the prevention or burdening of exporting, but the prevention of raising for market, and marketing, cotton in excess of the allotment. As to cotton, a great portion of it, whether sold on this or the other side of the water, moves in export trade.

---

[3] Hawaiian Gas Products v. Commissioner, 9 Cir., 126 F.2d 4.

[4] 3 F. R. 1583.

[5] Act Sec. 301(b) (6) (A), 7 U.S.C.A. § 1301(b) (6) (A).

If the penalty is a tax or duty on exports, it is just as much a burden on the immense amount of it sold on this side for movement export as on the smaller part of it exported first and then sold on foreign markets. In suits under and in the decisions[6] sustaining the act, no one has put forward the revolutionary contention now made. It may not be doubted that it was intended to have the penalty apply to all cotton whether sold for export or import, or whether sold in the United States or abroad. The act in terms makes provision for the purchaser collecting the penalty when the sale is made in the United States, and it is quite clear that unless the act had intended to reach all cotton equally, no matter where or when sold, it would have been quite abortive. It has been specifically held that the penalty is not a tax.[7] Besides the authorities make it quite plain that the invoked constitutional provision does not apply to a situation of this kind where a tax or duty is laid generally on the manufacture or handling of products.[8] It applies only where it is laid specifically or exclusively on exports or matters directly connected with exports.[9]

Since the judgment must be reversed with directions to enter judgment for the penalty, it becomes necessary to determine whether and what interest should be allowed. The United States contends that interest is recoverable on the penalties from January 20, 1940, the last known date of delivery of the cotton to the spinners, to the date of judgment. It is conceded by the government that neither the Act nor the regulations in terms require payment of interest on the penalties. It is stated in the Government's brief that interest has been, and is being in fact, collected on overdue marketing penalties under the rule laid down by the Supreme Court, that interest shall be collected in all cases where equitably due unless forbidden by statute.[10] Appellee, invoking the general rule that interest is not recoverable on statutory penalties unless allowed by the statute, insists, citing many Texas cases, that interest cannot be recovered either before or after judgment. Further citing 28 U.S.C.A. § 811, "Interest on judgments," providing that in all judgments in civil cases, where by the law of the state in which such court is held interest may be collected on state judgments, interest shall be allowed, it insists that no interest is allowed upon a judgment for a penalty in the State of Texas, and, therefore, none may be on penalty judgments in United States Courts sitting in Texas.

We agree with appellee that interest before judgment is not collectible on a statutory penalty unless given by the statute and that since in fact and in law the amount sued for is a penalty, no interest can be recovered on it before judgment. We do not agree, however, that interest cannot be recovered after judgment. The general rule is that a judgment in a civil suit, for a penalty, carries interest the same as any other civil judgment, and while there are Texas cases to the contrary, it is not at all clear that the settled Texas rule is that a judgment for a penalty provided by Texas statutes does not carry interest. But if we could agree with appellee that under Texas penalty statutes no interest is allowed on a judgment, we could not agree that this would follow as to judgments on federal penalty statutes in the United States Courts. The statute, Section 811, providing for interest on judgments where by law of the state interest is collectible on state judgments, is a general

---

6 Troppy v. La Sara Farmers Gin Co., 5 Cir., 113 F.2d 350; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L.Ed. 122.

7 Rodgers v. United States, 6 Cir., 138 F.2d 992.

8 Barclay & Co. v. Edwards, 267 U.S. 442, 45 S.Ct. 135, 348, 69 L.Ed. 703; Liggett & Myers Tobacco v. United States, 3 Cir., 77 F.2d 65; Cornell v. Coyne, 192 U.S. 418, 24 S.Ct. 383, 48 L. Ed. 504.

9 Fairbanks v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862; Thames & Mersey Marine Ins. Co. v. United States, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821, Ann.Cas.1915D, 1087.

10 Cf. Young v. Godbe, 15 Wall. 562, 82 U.S. 562, 21 L.Ed. 250; Billings v. United States, 232 U.S. 261, 34 S.Ct. 421, 58 L. Ed. 596.

one, and since the Texas statute for interest on judgments[11] is also general, it is quite plain that interest runs on all federal court judgments unless the judgment is one which by federal law does not bear interest. We have been cited to no case, we have found none, holding that a judgment in a civil suit in a United States court for a penalty fixed by federal statute will not draw interest. We think, following the general rule that while penalties do not draw interest, judgments for penalties do, that the judgment for penalties to be entered in this case should draw interest from its entry.

The judgment is reversed and the cause is remanded for further and not inconsistent proceedings.

---

[11] 15 Vernon's Annotated Texas Civil Statutes, Art. 5072, Rate on judgments: "All judgments of the courts of this State shall bear interest at the rate of six per cent per annum from and after the date of the judgment, * * *."