## RODGERS *v.* UNITED STATES.

No. 58.   Argued October 16, 1947.—Decided November 10, 1947.

Petitioner submitted on brief *pro se.*

*Stanley M. Silverberg* argued the cause for the United States.   With him on the brief were *Solicitor General Perlman, Assistant Attorney General Sonnett, J. Stephen Doyle, Robert W. Ginnane* and *W. Carroll Hunter.*

MR. JUSTICE BLACK delivered the opinion of the Court.

In the years 1940, 1941 and 1942 the petitioner produced on his farms and sold more cotton than the quota allotted him under authority of Part IV of the Agricultural Adjustment Act of 1938 as amended. 52 Stat. 31, 55–60; 55 Stat. 203; 7 U. S. C. §§ 1281 *et seq.* The United States filed this suit against petitioner to recover money "penalties" to which § 348 [1] of the Act makes non-cooperating farmers "subject" who market cotton from their farms in excess of their quota. The District Court rendered judgment for $7,039.52 in penalties plus interest at 6% from the various dates the penalties became due to the date of judgment. The Sixth Circuit Court of Appeals affirmed. 158 F. 2d 835. The Fifth Circuit had previously·decided that no interest is allowable on such penalties prior to judgment. *United States* v. *West Texas*

---

[1] Section 348 of the 1938 Act reads as follows:

"Any farmer who, while farm marketing quotas are in effect, markets cotton in excess of the farm marketing quota for the marketing year for the farm on which such cotton was produced, shall be subject to the following penalties with respect to the excess so marketed: 2 cents per pound if marketed during the first marketing year when farm marketing quotas are in effect; and 3 cents per pound if marketed during any subsequent year, except that the penalty shall be 2 cents per pound if cotton of the crop subject to penalty in the first year is marketed subject to penalty in any subsequent year." 52 Stat. 59; 7 U. S. C. § 1348.

The 1941 amendment required computation of the penalty on the following basis:

"That notwithstanding the provisions of the Agricultural Adjustment Act of 1938, as amended (hereinafter referred to as the Act) —

.          .          .          .          .

"(9) The marketing penalty for cotton and rice produced in the calendar year in which any marketing year begins (if beginning with or after the 1941–1942 marketing year) shall be at a rate equal to 50 per centum of the basic rate of the loan for cooperators for such marketing year under section 302 of the Act and this resolution." 55 Stat. 203, 205; 7 U. S. C. (Supp. V, 1946), § 1330 (9).

*Cottonoil Co.,* 155 F. 2d 463. We therefore granted certiorari limited to this single question. 331 U. S. 799.

Since penalties under the Agricultural Adjustment Act are imposed under an Act of Congress, they bear interest only if and to the extent such interest is required by federal law. *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 714–716; *Royal Indemnity Co.* v. *United States,* 313 U. S. 289, 295–297. There is no language in the Agricultural Adjustment Act or in any other act of Congress which specifically allows or forbids interest on penalties such as these prior to judgment.[2] But the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. *Billings* v. *United States,* 232 U. S. 261, 284–288. For in the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court. See, *e. g., Royal Indemnity Co.* v. *United States, supra; Board of Comm'rs* v. *United States,* 308 U. S. 343.

As our prior cases show, a persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained. See,

---

[2] 28 U. S. C. 811 does allow interest on district court judgments in all civil cases where interest would be allowed by the law of the state in which the court is held.

*e. g., Brooklyn Savings Bank* v. *O'Neil, supra; United States* v. *North Carolina,* 136 U. S. 211, 216; *Funkhouser* v. *J. B. Preston Co.,* 290 U. S. 163, 168.

The contention is hardly supportable that the Federal Government suffers money damages or loss, in the common law sense, to be compensated for by interest, when one convicted of a crime fails promptly to pay a money fine assessed against him. The underlying theory of that penalty is that it is a punishment or deterrent and not a revenue-raising device; unlike a tax, it does not rest on the basic necessity of the Government to collect a carefully estimated sum of money by a particular date in order to meet its anticipated expenditures. For the foregoing reasons this Court's holding that a criminal penalty does not bear interest, *Pierce* v. *United States,* 255 U. S. 398, 405–406, is consistent with its holding that the Government does suffer recoverable damages if a taxpayer fails to pay taxes when due and is therefore equitably entitled to interest. *Billings* v. *United States, supra.* Furthermore, denial of interest on criminal penalties might well be rested on judicial unwillingness to expand punishment fixed for a criminal act beyond that which the plain language of the statute authorizes.

Viewed in light of these principles, we think that the question of interest on the penalties provided in the Agricultural Adjustment Act on non-cooperators should be governed by the rule previously applied by this Court to criminal fines. Although Congress neither wholly prohibited nor made it a crime for a farmer to market cotton in excess of his quota, still it imposed sanctions upon non-cooperators analogous to those of the criminal law. The purpose of Congress in requiring payment of penalties into the Federal Treasury for marketing above the allotted amount was not to raise revenue for the Government's financial advantage but to deter farmers from planting and marketing more than their quotas. In fact, the whole

philosophy of the Agricultural Adjustment Act is based on the theory that the public will be benefited, not damaged, if farmers produce and market within these quotas, thereby avoiding the payment of penalties. The framework of the Act itself, both as originally passed and as amended, and the reports of the congressional committees that drafted it, show a prime purpose to limit national and individual farm production and marketing to the quotas allotted, and show that the penalties were solely intended to deter farmers from exceeding those quotas.[3] After careful consideration the original 1938 Act was amended in 1941 for the express purpose of making the farmers' penalties higher, because the prior penalties had not in practice proved a severe enough sanction to reduce production the desired amount. The House committee said in its report on the 1941 amendment:

> "As in the case of corn and wheat, it appears that the present rate of penalty [for cotton] is too low to result in the desired adjustment of the amount to be marketed during the marketing year."[4]

And with reference to wheat and corn, the committee had reported:

> "With the higher penalties, it is expected that growers generally will store the farm marketing excesses rather than pay the penalty and place the commodity on the market at the time when it is not needed."[5]

In addition to these high penalties, the Act, as originally passed and as amended, wholly deprived non-cooperators like petitioner of substantial benefits authorized by the

---

[3] Sen. Rep. No. 1295, 75th Cong., 2d Sess., 6 (1937); H. R. Rep. No. 1645, 75th Cong., 2d Sess., 1, 36 (1937); H. R. Rep. No. 1767, 75th Cong., 3d Sess., 90 (1938); H. R. Rep. No. 364, 77th Cong., 1st Sess., 3 (1941).

[4] H. R. Rep. No. 364, 77th Cong., 1st Sess., 3 (1941).

[5] *Id.* at 2.

Soil Conservation Act and of a large part of the loañ value provided by the Government for cotton farmers who did not exceed their quota.[6] We are unable to say that it would be consistent with the congressional purpose for the courts to add interest to these very substantial penalties already imposed upon non-cooperating farmers.[7]

*Reversed.*

MR. JUSTICE BURTON, dissenting.

The sums due to the Government are fixed obligations with fixed times of payment. They are debts incidental to the lawful conduct of business and not penalties imposed for violations of law. Accordingly, the debtor should pay and the Government should collect interest on them, as on other debts to the Government, to compensate for delays in their payment. The Agricultural Adjustment Act expressly fixed the amount and time for payment of the sums in question although it did not expressly mention the accrual or denial of interest on delayed payments. However, the federal rule is well-established that, without express statutory reference to the subject of interest, interest is due to the Government on unpaid statutory debts after they have become due in fixed amounts at fixed times, such as those for customs duties and taxes.

---

[6] §§ 302 (c), 349 of the Agricultural Adjustment Act of 1938; 52 Stat. 43, 59; 7 U. S. C. § 1302 (c), 1349.

[7] See as to penalties in general, *Helwig* v. *United States*, 188 U. S. 605; *United States* v. *Chouteau*, 102 U. S. 603; *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 401; *Helvering* v. *Mitchell*, 303 U. S. 391; *United States* v. *Childs*, 266 U. S. 304; *Rodgers* v. *United States*, 138 F. 2d 992. For decisions of state courts which grant interest on statutory obligations but disallow interest on statutory penalties, see cases collected in Note, 27 Ann. Cas. 1913 B, 853, 855–856; Note, 28 L. R. A. (N. S.) 1, 74–75 (1910); 1 *Sutherland, Damages,* § 330 (1916).

> "Thus, as to the necessity for a statute it was long ago here decided in view of the true conception of interest, that a statute was not necessary to compel its payment where in accordance with the principles of equity and justice in the enforcement of an obligation, interest should be allowed." *Billings* v. *United States,* 232 U. S. 261, 286.[1]

This statement was made by Chief Justice White, speaking for the Court, in a case upholding the collection of interest on a tax payable to the United States, under a statute that contained no reference to the accrual of interest.

The requirement that interest be paid to the Government upon the debts due to it under the Agricultural Adjustment Act not only is "in accordance with the principles of equity and justice" called for by the general rule just stated but the accrual of interest in favor of the Government under that Act also is thoroughly consistent with, and helpful to, the accomplishment of its purpose of price and crop control. The disallowance of such interest is equally inconsistent with, and a limitation upon, the accomplishment of that purpose.

---

[1] "The conflict between the systems is pronounced and fundamental. In the one, the state rule, except as to contract, no interest without statute; in the United States rule, interest in all cases where equitably due unless forbidden by statute. In one no suit for taxes as a debt without express statutory authority, in the other the right to sue for taxes as for a debt in every case where not prohibited by statute.

"From this review it results that the doctrine as to non-liability to pay interest for taxes which have become due which prevails in the state courts is absolutely in conflict with the doctrine applied to the same subject in this court and cannot now be made the rule without repudiating settled principles which have been here applied for many years in various aspects and without in effect disregarding the sanction either expressly or impliedly given by Congress to such rules. . . . Under this condition we can see no ground for departing from the rule which the cases enforced, . . . ." *Billings* v. *United States, supra,* at pp. 287–288.

378

The defaulted payments on which interest is claimed here became due because of the petitioner's sales of cotton in excess of his statutory quota and such payments are referred to in the Act as "penalties." However, the context shows that, instead of being criminal penalties imposed for violations of the law, they are "marketing penalties" consisting of governmental charges added to the presale expenses of the seller, especially to help keep prices and sales in line with the economic program of the Government. Satisfaction of these charges is made a condition of the seller's *legal* right to sell his excess cotton at a particular time. They are the very opposite of penalties imposed for making *illegal* sales. They are lawful, "ordinary and necessary" business expenses incidental to his sales. They are deductible from his taxable income, whereas criminal penalties are not deductible from taxable income.[2] These "marketing penalties" are also unlike

---

[2] "Although the amounts paid by the producer are designated as penalties in the statute and regulations referred to above, it appears that the purpose of the statute is to place a charge against the producer on the sale of the commodity which was produced in excess of the quota. The statute does not prohibit producers from producing the commodity, but merely places a charge on the excess of the quota produced and marketed. The so-called penalties are not paid for the violation of, or noncompliance with, a statute or regulation or for any illegal act, but are paid for the purpose of legalizing the marketing of the excess production, which with this condition the statute sanctions, and are, therefore, made in compliance with the statute. It is accordingly the view of this office that the so-called penalties are deductible from gross income under section 23 (a) of the Internal Revenue Code in computing net income as ordinary and necessary expenses incurred in carrying on a trade or business." I. T. 3530, 1942–1 Cum. Bull., 43, 45–46.

Payments in the nature of penalties for the *violation* of federal or state statutes in the ordinary use of that term are not deductible. *Commissioner* v. *Longhorn Portland Cement Co.,* 148 F. 2d 276; *Burroughs Bldg. Material Co.* v. *Commissioner,* 47 F. 2d 178; *Great Northern R. Co.* v. *Commissioner,* 40 F. 2d 372.

criminal penalties in that they may be paid in advance, deposited in escrow or security given for their payment. When that is done, the seller may, in his usual manner, dispose of the excess-quota cotton to which the payments relate. Cotton marketing quota regulations, 1942–43, § 722.440 (c), 7 Fed. Reg. 4369; *id.* § 722.453, 7 Fed. Reg. 4374. These debts are more comparable to customs duties than to criminal penalties.[3] Apparently these charges are collectible by the Government only by civil proceedings and liability for them need not be established beyond a reasonable doubt. *Usher* v. *United States,* 146 F. 2d 369, 371.

The payments are imposed in part for revenue purposes although especially as a means of inducing cotton owners to control their sales of cotton in interstate and foreign commerce in accordance with the economic policies of the Government. During its consideration of the Agricultural Adjustment Act, Congress declined to adopt a proposal to treat such sales as in violation of law [4] and

---

[3] Customs duties are personal debts to the United States. *Meredith* v. *United States,* 13 Pet. 486, 493. Interest is collectible on the debt to the Government arising out of the imposition of customs duties. *United States* v. *Mexican International R. Co.,* 154 F. 519. It is common knowledge that, while some customs duties or tariffs may have been levied "for revenue only," many have been enacted as "protective tariffs" in which a primary interest of the Government was, as under the Agricultural Adjustment Act, to restrict the flooding of the market with certain goods at a certain time. The collection of interest on delayed payments of customs duties would bear a similar relation of helpfulness to the Government's economic and financial policies as would the collection of interest on defaulted market penalties. The Government, under the Agricultural Adjustment Act, not only seeks to restrict excess-quota sales, but it also seeks to add to its current cash resources from which it proposes to make the loans to cooperating producers which are authorized by the Act.

[4] § 33, H. R. 8505, 75th Cong., 2d Sess. (1937), as passed by the Senate but later rejected.

adopted instead the policy recognizing such sales as lawful sales conditioned upon payment to the Government of the charges here being considered. Financial burdens which may be postponed without the payment of interest are much less burdensome than those that are not post-ponable or that are subject to the accrual of interest during their postponement. The omission of the usual interest charge on postponed marketing penalties there-fore decreases the force of the Act as a deterring factor and runs counter to the special purpose of the Act.

For these reasons, the judgment of the Circuit Court of Appeals, affirming that of the District Court allowing interest from the date of default, should have been affirmed.

Mr. Justice Rutledge joins in this dissent.