37 F.3d 1517
 308 U.S.App.D.C. 390
 NORTHERN CALIFORNIA POWER AGENCY and Cities of Anaheim,
Azusa, Banning, Colton, and Riverside, California,
Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent
Pacific Gas and Electric Company; Sacramento Municipal
Utility District, Intervenors.
 No. 93-1242.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Sept. 9, 1994.
Decided Oct. 21, 1994.
 
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Frances E. Francis, argued the cause for petitioners. With her on the briefs were Ben Finkelstein and Margaret A. McGoldrick.
 Randolph Lee Elliott, Atty., F.E.R.C., argued the cause for respondent. With him on the brief were Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., F.E.R.C. Joel M. Cockrell, entered an appearance.
 Stuart K. Gardiner argued the cause for intervenor Pacific Gas and Elec. Co. With him on the brief were Douglas A. Oglesby and Lindsey How-Downing.
 Charles H. Cochran, entered an appearance for intervenor Sacramento Mun. Utility Dist.
 Before: EDWARDS, SENTELLE, and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 For many years Pacific Gas and Electric Company operated two hydro-electric projects in California under the authority of long-term federal licenses. As the terms neared completion, the Federal Energy Regulatory Commission began relicensing proceedings under section 15 of the Federal Power Act, 16 U.S.C. Sec. 808. Pacific Gas applied for a new license on each project. In joint applications filed in 1980 and 1982, so did the Sacramento Municipal Utility District and the petitioners in this case--the Northern California Power Agency and the Cities of Anaheim, Azusa, Banning, Colton, and Riverside, California.
 
 
 2
 Section 7(a) of the Federal Power Act, 16 U.S.C. Sec. 800(a), confers a preference on states and municipalities in original licensing proceedings. In 1980, the Commission decided that the preference also applied in relicensing proceedings, including those in which the incumbent licensee sought to maintain its authority to operate. City of Bountiful, 11 F.E.R.C. p 61,337, reh'g denied, 12 F.E.R.C. p 61,179 (1980). The Eleventh Circuit sustained the Commission's interpretation, and the Supreme Court denied the petitions for certiorari, despite the Solicitor General's confession that the Commission now viewed Bountiful as incorrect. Alabama Power Co. v. FERC, 685 F.2d 1311 (11th Cir.1982), cert. denied, 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983). Thereafter, the Commission overruled Bountiful. Pacific Power & Light Co., 25 F.E.R.C. p 61,052 ("Merwin"), reh'g denied, 25 F.E.R.C. p 61,290 (1983). This court sustained the Commission's reinterpretation that no municipal preference applies to relicensing proceedings in which the incumbent licensee seeks to remain on the project. Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074 (D.C.Cir.1987) (in banc), cert. denied, 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988). (An earlier panel opinion had reached the opposite conclusion. Clark-Cowlitz Joint Operating Agency v. FERC, 775 F.2d 366 (D.C.Cir.1985), vacated, 787 F.2d 674 (D.C.Cir.1986).)
 
 
 3
 In the meantime Congress enacted the Electric Consumers Protection Act of 1986, Pub.L. No. 99-495, 100 Stat. 1243, amending the Federal Power Act to make clear that the municipal applicant's preference at the project's original licensing stage does not apply on relicensing when an existing licensee seeks a new license. (Congress exempted the Clark-Cowlitz controversy, then pending in this court, see Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d at 1086 n. 12.) Section 10 of the 1986 Act, 100 Stat. 1252-55, contained procedures uniquely applicable to the nine pending Commission relicensing proceedings, including the two at issue in this case, in which the competing municipalities filed or maintained their applications after the Bountiful decision but before the 1986 Act.
 
 
 4
 While these developments were taking place the relicensing proceedings with which we are concerned were lumbering along. Pacific Gas's licenses had long since expired, but it continued operating the hydroelectric plants pursuant to yearly licenses from the Commission. Matters came to a head in January 1987 when Pacific Gas invoked section 10(c), which is condensed in the margin,[1] making an "election" in both relicensing proceedings to negotiate with its competing applicant over "compensation"--in other words, to settle the cases. Following section 10(d),[2] Sacramento Municipal and the "cities," as we shall call petitioners, accepted the elections, withdrew their competing license applications, and entered into negotiations with Pacific Gas regarding what, if anything, the company should give them in light of section 10(e), of which more hereafter. When the parties failed to reach agreement within the prescribed time, the Commission set the matter down for an adjudication. Sacramento Municipal and Pacific Gas then negotiated a settlement, which the Commission approved.
 
 
 5
 As to the cities, the Commission ordered Pacific Gas to pay them nearly $2 million for the costs they had incurred in pursuing their license applications. Pacific Gas & Electric Co., "Order Determining Compensation," 61 F.E.R.C. p 61,216 (1992). The Commission rejected the cities' demands that Pacific Gas also pay them interest on those costs running from the date they were incurred, and some $50 million in "additional compensation," a figure representing more than one-half of Pacific Gas's net investment in the two projects. After the Commission denied rehearing, Pacific Gas & Electric Co., 62 F.E.R.C. p 61,120 (1993), the cities filed this petition for review. (The parties to the other seven relicensing proceedings subject to section 10 of the 1986 Act settled their disputes.)
 
 
 6
 * The cities' main complaint, measured by the amount of money involved, is that the Commission misinterpreted the 1986 Act and failed to give a reasoned explanation why the cities should not receive an "additional sum" from Pacific Gas--that is, a "reasonable percentage" of the company's $89,023,418 "net investment" in the two projects. Pacific Gas & Elec. Co.,40 F.E.R.C. p 61,218, at 61,743 (1987). As to why the Commission should have taken anything more than $2 million from Pacific Gas's pocket and handed it to the cities, the cities say sections 10(e)(2) and 10(f) entitled them to more.
 
 Section 10(e) reads:
 
 7
 (e) If an election to negotiate is made pursuant to subsections (c) and (d) for any project, the existing licensee and the competing applicant shall commence negotiations for each of the following:
 
 
 8
 * * * * * *
 
 
 9
 (2) Compensation in an additional sum (which may be in money or electric power or both) representing a reasonable percentage (but not to exceed 100 percent) of the net investment of the existing licensee in the project ... The parties to the negotiation shall establish the method, period, and manner of providing all such compensation.
 
 
 10
 100 Stat. 1253-54.
 
 
 11
 When the negotiations mentioned in section 10(e) bear no fruit, as happened here, the Commission gets to apply section 10(f). This authorizes the agency to order "compensation in accordance with paragraphs (1) and (2) of subsection (e)." With respect to the legal principles that should guide the Commission's decision, section 10(f) contains this instruction:
 
 
 12
 The Commission shall also take into consideration all of the following:
 
 
 13
 (1) The quality of the relicensing proposals of the existing licensee and the competing applicant.
 
 
 14
 (2) The net benefits to both parties and their customers of obtaining the new license.
 
 
 15
 (3) The extent to which the applications filed by both parties were actively pursued ... and filed with the Commission in good faith.
 
 
 16
 (4) The extent of reliance by the competing applicant on the provisions of the Federal Power Act in effect prior to enactment of this Act and the detrimental impact of such reliance on the operations and on the service area of the applicant.
 
 
 17
 The first thing one may notice about sections 10(e) and 10(f) is that neither guarantees the competing applicant anything. "Congress," the Commission rightly observed, "created no presumptions regarding either the level of compensation or whether any additional compensation was necessary." Pacific Gas & Elec. Co., 48 F.E.R.C. p 61,158, at 61,615 (1989). The parties must negotiate about additional compensation. Yet nothing may come of their bargaining. As to section 10(f), it merely directs the Commission to consider several factors. It does not predetermine the outcome of the Commission's consideration. What legal standard the Commission is to apply is uncertain from the face of the legislation. Section 10(f) is silent with respect to the relative importance of the factors it lists and there is scarcely a hint about how the Commission is to translate its "consideration" into a percentage of the incumbent licensee's net investment expressed in dollars. As the Commission wrote, the 1986 Act "does not specify what percentage of the existing licensee's net investment is payable as compensation with respect to any particular factor" (61 F.E.R.C. at 61,802).
 
 
 18
 The Commission's task therefore was to bring coherence to section 10, to extract legal principles consistent with its terms. City of Mesa v. FERC, 993 F.2d 888, 892-93 (D.C.Cir.1993). This the Commission accomplished. It considered the first three factors--section 10(f)(1) to (3)--and found the parties even--a "wash" as the Commission put it--in (1) the quality of their applications; (2) the net benefits to them and their customers; and (3) the extent to which both sides pursued their applications. 61 F.E.R.C. at 61,804. As to the remaining factor, the Commission found that the cities had relied on Bountiful in filing their applications but had not shown, in the words of section 10(f)(4), any "detrimental impact of such reliance on the operations and on the service area of the applicant." By awarding the cities nothing in light of this evaluation, the Commission set down a standard: those who are unable to show detrimental reliance under section 10(f)(4) cannot receive additional compensation unless there is a strong likelihood that they would have obtained the new license. This is sensible in light of section 15(a) of the Federal Power Act, 16 U.S.C. Sec. 808(a), which requires the winner in a relicensing proceeding to pay the loser, but only if the loser happens to be the incumbent licensee. That is, if a competing applicant is awarded a new license in relicensing proceedings, the new licensee must compensate the incumbent in an amount equal to the incumbent's net investment in the project. By analogy, one might say that a competing applicant should receive compensation if it is able to show the 1986 Act deprived it of a license it otherwise would have been awarded. The analogy, however, is not perfect: unlike an existing licensee, competing applicants have invested nothing in the project; if they lose the relicensing battle, the existing licensee is not required to pay them anything under section 15(a) of the Federal Power Act. But the analogy is close enough to allow the Commission to decide, rationally we believe, that the cities should not be treated like an existing licensee if consideration of the first three section 10(f) factors results in a wash and the cities have not lost any opportunities of the sort section 10(f)(4) describes.
 
 
 19
 The cities object on the basis that the Commission's analysis fails to compensate them for their "frustrated expectations." Of course losing litigants have their expectations frustrated all the time, except when they have been realistic enough to expect frustration. Ordinarily they do not, for that reason, get compensated by the winner. We do not doubt, nor did the Commission, that the cities had high hopes for economic gain when they filed their applications in the wake of Bountiful, although these must have diminished considerably when the Commission did an aboutface in Merwin. The problem is not in the cities' description of what they anticipated. It is that nothing in the text of section 10(e)(2) or section 10(f) supports the idea that "frustrated expectations" measure compensation based on a percentage of net investment. In the first place, section 10(f) requires the Commission to compare one party with the other; the cities' proposal looks only at the point of view of the competing applicant. In the second place, what economic benefits could the cities have expected? Not the $89 million from Pacific Gas, representing the company's net investment, the figure used in section 10(e)(2). If the cities had been awarded the new licenses, they would have paid $89 million to Pacific Gas, as section 15(a) of the Federal Power Act required. They would have gladly done so because the present value of the net benefits of the two projects to the competing applicants totalled between $692 million and $996 million. 61 F.E.R.C. at 61,807-08. But equating present value of the net benefits with frustrated expectations--which is where the cities' argument leads--would doubtless have required the Commission to grant competing municipal applicants 100 percent of the existing licensee's net investment in every case, regardless of what the Commission's consideration of the section 10(f) factors happened to reveal. Whatever Congress had in mind, we are certain it was not that.
 
 
 20
 Apart from the section 10(f)(1)-(3) factors, the Commission considered whether the cities might be entitled to compensation because of section 10(f)(4), a factor the Commission viewed as "independent" so that it might support an award to an applicant who had failed to demonstrate any superiority over the incumbent licensee in the section 10(f)(1)-(3) comparison. The cities, however, failed to show the sort of detrimental reliance section 10(f)(4) demanded. There is nothing to the cities' protest that the Commission erred in so ruling. The cities offered no specific examples of potentially foregone alternative investments, or any other specific evidence of detrimental impact on them as a result of their relying on Bountiful and applying for the licenses then held by Pacific Gas. 48 F.E.R.C. at 61,613-14.
 
 II
 
 21
 Citing the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A), and Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983), the cities claim the Commission acted arbitrarily and capriciously, because it inadequately explained the connection between its findings about the four section 10(f) factors and its conclusion that no additional compensation was due. We see things differently. The Commission neither ignored any of the four factors set out in section 10(f), nor considered matters the statute rendered off limits. The Commission supported its decision with evidence; took care to include all calculations concerning its analysis of the section 10(f)(1)-(3) factors in the appendices to its Order Determining Compensation (61 F.E.R.C. at 61,804-10); thoroughly discussed its comparison of Pacific Gas with the cities; and sufficiently explained why this comparison amounted to a "wash." Id. at 61,804. The Administrative Procedure Act demands no more.
 
 
 22
 We do not agree with the cities that "[t]he Commission's Order Determining Compensation constitutes an unjustified reversal from its prior decisions regarding ECPA section 10(e)(2) compensation." Petitioners' Brief at 27. It is true that an agency acts arbitrarily when it departs from its precedent without giving any good reason. Pontchartrain Broadcasting Co. v. FCC, 15 F.3d 183, 185 (D.C.Cir.1994); IRS v. FLRA, 963 F.2d 429, 434 (D.C.Cir.1992). Here the Commission did no such thing. Its later order was not inconsistent with the earlier one. In the Order Establishing Procedures and Dismissing Appeals, the Commission's concern was that it address all four factors of section 10(f). 61 F.E.R.C. at 61,609. The Commission emphasized that section 10(f)(4) "does not require [the competing applicant] to demonstrate that it would have obtained the licenses under" the law existing before the 1986 Act. 61 F.E.R.C. at 61,614. Later, in its Order Determining Compensation, the Commission interpreted section 10(f) to require that the municipal applicant show either superiority in the factors in section 10(f)(1)-(3), or actual detrimental reliance under section 10(f)(4). 61 F.E.R.C. at 61,804. This is entirely consistent with the Commission's initial rejection of Pacific Gas's proposal that unless the cities demonstrate "superiority" in the section 10(f)(1)-(3) factors, they can collect not a dime of "additional" compensation.
 
 
 23
 The Commission's decision not to require Pacific Gas to pay additional compensation to the cities is not impugned by its approval of the Pacific Gas-Sacramento Municipal settlement. Both the settlement and the outcome of the Commission's Order Determining Compensation fall within a permissible range under the statute. The differences in the exact amounts are attributable to the simple fact that Sacramento Municipal settled out of court, or more accurately, out of agency, and the cities did not. It would be nonsensical for an agency to adjust every judgment it rendered in order to conform to the results of related out-of-agency settlements. Parties settle in order to avoid the costs of litigation, including its uncertainty. The Commission said as much in its Order Denying Rehearing. 62 F.E.R.C. at 61,806-07.
 
 
 24
 Last on the cities' list of arbitrary and capricious actions is the Commission's decision to apply a uniform 15 percent discount rate. As Pacific Gas's expert explained, "[a] discount rate is a rate of compound interest at which one compares present or future cash flows or other values paid or received at different times." The choice of discount rate and the corresponding results of the calculations were important in the Commission's comparison of net benefits under section 10(f)(2). The Commission chose to apply a uniform discount rate to represent the rate applicable to the customers rather than the applicants. 61 F.E.R.C. at 61,807. The cities detect an error in this, claiming that the Commission should have used the competing applicants' discount rates. Because the cities have a lower cost of capital than Pacific Gas, the argument is that the Commission should have applied a lower discount rate to them, giving the cities a greater net benefit and thus superiority. The premise of the cities' position is that the relevant "discount rate" and the applicants' "cost of capital" are synonymous. They are not. Consumer and utility discount rates are "quite different in concept." See James C. Cater, You Say Banana ..., 130 No. 12 PUB. UTIL. FORT. 16, 16-17 (1992). "The former relates not to consumers' cost of money, but rather to preferences and tastes. The latter takes no account of such intangibles but relies solely on the firm's cost of money." Id. The Commission adopted Pacific Gas's reasoned explanation of the distinction, as it was entitled to do. 61 F.E.R.C. at 61,807. Distinguishing the utilities' costs of capital and the relevant consumer discount rate, the analysis used a uniform 15 percent discount rate for both parties to reflect the discount rate of the parties' customers in the aggregate.[3]
 
 
 25
 Section 10(f)(2) requires the Commission to consider the net benefits "to both parties and their customers." 100 Stat. 1254 (emphasis added). Presumably, both the cities and Pacific Gas would pass through to the customers the benefits of their reduced energy costs from securing the licenses to the two projects. Since the amount the customers would pay through their electric rates would depend on which utility gets the license, the customers have a strong interest in the outcome. Additionally, when determining the net present benefit of a project, a discount rate that reflects society's, as opposed to an individual's, preferences is commonly used. E.J. MISHAN, COST BENEFIT ANALYSIS 176 (1976). It was therefore entirely proper for the Commission to calculate the present value of the net benefits of the projects using a discount rate that focused on the consumers' value of money.
 
 
 26
 Having adopted a discount rate applicable to consumers, the Commission used the same discount rate for both parties, explaining that it did so "in the interest of consistency." 61 F.E.R.C. at 61,807. Theoretically, the ratepayers for the two parties could have different discount rates. However, it is reasonable to assume that customers have similar preferences and costs in the aggregate and thus to apply a consistent discount rate. No evidence in the record suggests that the make-up of Pacific Gas's customers as a group differs significantly from the make-up of those who would have been the cities' customers. The short of the matter is that while the cities' lower cost of capital could result in a lower discount rate in calculating the net present value to the cities, it has no bearing on the discount rate used to calculate the present value of the benefit to consumers.
 
 III
 
 27
 The cities think the Commission should have required Pacific Gas to pay them prejudgment interest on their costs under section 10(e)(1), that is, interest accruing prior to the Commission's Order Determining Compensation. Nothing in section 10(e)(1) mentions such an award. While this might not necessarily bar prejudgment interest, see Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 6-7, 92 L.Ed. 3 (1947), the Commission was within its bounds in refusing to read anything into Congress' silence. The text of the 1986 Act supports the Commission's decision. Section 10(e)(1) states that municipal applicants like the cities should be reimbursed for "costs" accrued before December 31, 1985. Because any prejudgment interest could not have accrued before that date, the statute reflects an intent not to provide for it. Any prejudgment interest the cities could have claimed would have begun to accrue on March 27, 1987, the date they accepted Pacific Gas's election to negotiate for compensation. Section 10(e)(1) does use the broad term "compensation," but it defines compensation by enumerating certain specifically identifiable costs. Prejudgment interest is not one of them. The 1986 Act specifically provides for interest in section 10(g). The absence of a corresponding provision in section 10(e)(1) suggests that one was not contemplated, and it is entirely understandable why. Prejudgment interest compensates for the delay in receipt of payment. See Turner v. Japan Lines, Ltd., 702 F.2d 752, 756 (9th Cir.1983). Here, absent settlement, the cities were not entitled to payment until the Commission rendered its Order Determining Compensation finding that Pacific Gas owed them some $2 million under section 10(e)(1). The cities thus experienced no delay in payment during the period before the Commission's Order. The Commission fully explained its reasoning on this issue (61 F.E.R.C. at 61,604) and we sustain its decision.
 
 
 28
 The petition for review is denied.
 
 
 
 [1]
 Section 10(c) reads in part:
 (c) ELECTION PROCEDURES.--An existing licensee ... may file an election with the Commission under this subsection ... The election, subject to subsection (d), shall consist of an agreement that, in the case of the project concerned, the licensee will--
 (1) enter into good faith negotiations under subsection (e) with each person (or group of persons) who filed a competing application for a new license for the project ...; and
 (2) be subject to the provisions of this section.
 
 
 [100]
 Stat. 1253
 
 
 [2]
 Section 10(d) reads in part:
 (d) ACCEPTANCE OR REFUSAL TO ACCEPT ELECTION.--Within 45 days after receiving notice from the Commission of an election to negotiate made by the existing licensee under subsection (c) for an applicable project, each competing license applicant (or group of applicants) ... may--
 (1) accept the election, withdraw the competing application, enter into good faith negotiations in accordance with this section, and agree to be subject to the provisions of this section; or
 (2) refuse to accept such election.
 
 
 [100]
 Stat. 1253
 
 
 [3]
 The Commission recognized that the parties had different capital costs and applied the costs appropriately in determining the costs of capital improvements for the two projects to estimate the net benefits under section 10(f)(2). 61 F.E.R.C. at 61,807