MERRITT, Circuit Judge,
concurring in part and dissenting in part.
I. Seventh Amendment Requirements
This case, in which the trial court awarded a summary judgment of $65 million to the plaintiffs, is about the role of judge and jury in a constitutional system requiring that, in civil trials of legal claims in federal court, “the right of trial by jury shall be preserved.” U.S. Const, amend. VII.[1] The district court claimed for itself the determination that the defendants caused the plaintiffs $16.5 million in damages — a figure quadrupled to $65 million after application of RICO’s treble damages provision and the addition of $15.6 million prejudgment interest — despite substantial evidence' that the plaintiffs were themselves at least partly to[1] blame for their losses. Specifically, there is evidence that would allow a reasonable jury to find that the plaintiffs invested not because of the defendants’ misrepresentations but rather because of their own greed for tax deductions. The majority now sanctions the district court’s error and fails to even discuss the summary judgment and Seventh Amendment issues. The legitimacy of summary judgment *498 ceases when it devolves into “trial by affidavits.” It remains a bedrock principle that “[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
As the Supreme Court long ago explained,
Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer; these sit together, consult, apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion .... It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge.
R.R. Co. v. Stout, 84 U.S. (17 Wall.) 657, 664, 21 L.Ed. 745 (1874). In keeping with this sentiment, the Supreme Court has continually vindicated the Seventh Amendment against whatever novel procedural device has arisen in the name of efficiency and saving time and effort. “Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.” Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935) (holding additur unconstitutional).[2]
Although the district court intoned the familiar summary judgment standards, its opinion does not evidence any real engagement with the record or with the conflicting inferences that might be drawn from that record. The opinion reads as if the district court had tried the case itself. On the question of damages, in particular, the court simply accepted the plaintiffs’ theory of the case because it saves time to avoid a trial. That is impermissible summary-judgment procedure.
• I would not object if my colleagues had limited summary judgment to the question of the defendants’ fraudulent intent. The defendants failed to call their knowledge into dispute with affidavits, and there is no other evidence to support the defendants’ version of events. The inference the defendants suggest — that they knew nothing of the horse fraud — finds no support in the record. The same cannot be Said of causation, for there is-more than enough evidence to support the conclusion that the plaintiffs were motivated primarily by a passion for tax deductions that the law does not allow. The defendants’ misrepresentations were irrelevant, a jury might find. The majority ignores or dismisses evidence that the plaintiffs knew the truth about crucial elements of the mare-lease program. From this evidence a jury might reasonably conclude that the plaintiffs understood or were culpably blind to the illegality of the tax deductions advertised by the defendants. The jury might then further conclude that the plaintiffs *499 were not defrauded, but rather that they invited the transaction as an occasion for colorable tax deductions that the IRS might not investigate. And such a conclusion could justify the jury in denying the plaintiffs a judgment.
II. The Factual Issues
The important point about the mare-lease program is that it was not a simple exchange of cash for horses. It was primarily about tax breaks. If the plaintiffs knew those tax breaks were bad — whether because of a lack of economic substance or for some other reason — then the causal link between the defendants’ actions and the plaintiffs’ losses was broken. Though the majority emphasizes that the plaintiffs did not know about the shortfall of horses, that is contested and does not address the major flaws with the tax scheme, the primary reason for the transactions. There are at least four pieces of evidence to support a conclusion that the .plaintiffs knew the tax breaks were unsupportable, and that could lead a reasonable jury to find that the plaintiffs’ contribution to their losses should bar recovery.
1. Evidence that the plaintiffs knew National Equine Lending was not independent from ClassicStar. An essential feature of the mare-lease program was its ability to make long-term loans in order to achieve tax-deductible losses for investors. The scheme could hardly be cruder: 1) investor has past income on which he does not wish to pay taxes; 2) investor borrows a sum equivalent to past income; 3) investor uses borrowed funds on horse breeding, thereby creating a farming loss; and 4) investor uses that loss to wipe, out past income, thus avoiding taxes. A key tax requirement for this loss-creation mechanism is that the loans come from a lender independent from the corporation to be benefited by the loan proceeds. The loan may not be the risk of a party selling the tax scheme. But there is evidence here that at least two plaintiffs knew National Equine Lending was related to the seller, ClassicStar. Plaintiff Jaswinder Grover understood that ClassicStar “had influence over [National Equine Lending’s] interest rates and could — had an association or affiliate thereof.” See R. 1714 at 7 n. 19. Plaintiff Bryan Nelson of Nelson Breeders testified ' that he “suspected” National Equine Lending was affiliated with ClassicStar because of “some of the level that all the loans seemed to go through [National Equine Lending], the way there was kind of just a bit of a wink and a nod in terms -of, you know, you’ve got to appear at risk but not really.” See R. 1713 at 5. Despite knowledge of this flaw that would invalidate a large portion of their tax deductions, the plaintiffs invested anyway. Based on this evidence, a jury could reject the plaintiffs’ inconsistent claims that they would not have invested had they known the tax deductions were unsupportable.
The majority does not find this evidence material, because it does not show that “Plaintiffs knew that ClassicStar provided all of [National Equine Lending’s] funds or that they would not be required to repay their [National Equine Lending] loans.” Op. at 488. But as the plaintiffs’ own expert explained, the tax code precludes a taxpayer from deducting the value of a loan — even when he is personally liable on the debt — if the lender is “related” to a corporation to which the loan proceeds will flow. A lender and a corporation are “related” if they are “engaged in trades or business under common control.” See. R. 1701-10 at 41-15 (quoting 26 U.S.C. § 465(c)(3)(C)(ii)). Because independence between lender and beneficiary corporation is required to deduct the value of a loan, it is indeed material that the plaintiffs knew of the relationship between National Equine Lending and ClassicStar.
*500 2. Evidence that the plaintiffs knew the tax opinions were biased. The plaintiffs argue that they are not lawyers and that the opinions of established tax attorneys justified their investment. However, the plaintiffs were aware of a financial relationship between ClassicStar and the firms that provided the opinions. The firms disclosed that ClassicStar was paying for the opinions. Handler Thayer was especially explicit, stating that “legal fees received from ClassicStar, LLC increase with each transaction entered into by a client,” and that “our firm has a financial incentive for clients to participate.” R. 1888-5 at 12. The majority finds it important that the firms did not disclose, in so many words, that ClassicStar was providing them a “commission,” but disclosed just a payment or fee. The relevance of the distinction between a “fee” and a “commission” in this case escapes me. The plaintiffs knew ClassicStar was paying the firms for the opinions, and they knew the opinions were favorable to ClassicStar’s program in every .respect. That evidence is surely; sufficient for a jury to find that the plaintiffs knew the lawyers were essentially salesmen of the program. It would be reasonable for a jury to infer from this finding that, by relying only on the opinions of compromised attorneys, the plaintiffs did not invest in good faith.
3. Evidence that one plaintiff willfully ignored advice to seek independent tax counsel. In addition to not getting independent legal advice, at least one plaintiff was confronted with the inadequate nature of the tax opinions, yet hastened to invest. The defendants entered into the record an internal memo from an accountant at KPMG, plaintiff Nelson’s accounting firm. R. 1815-18. This memo assessed the lawyer-salesman’s tax opinion and analyzed the probability that, if he took the deduction in reliance on the opinion, Nelson would be assessed a penalty for underpayment of taxes without “reasonable cause,” per 26 U.S.C. § 6664. The memo concluded that the opinion financed by the sellers did not assess the specific facts of Nelson’s situation and that it appeared to be a “promoter” opinion. Nelson’s accountant advised that he disclose the mare-lease investment to the IRS or obtain a second, fact-based opinion in order to ensure that there was reasonable cause for the deduction. Nelson rejected the advice and “indicated that after consultation with his [promoter] attorneys that he wanted to. proceed without disclosing the treatment in his tax return, he would not engage [Hanna Strader] to issue an updated opinion, and he would not engage another law firm to get a second opinion letter.” Id. at 5. From this evidence that Nelson relied on a. “promoter” opinion to take an unreasonable tax deduction, the jury could conclude that Nelson caused his own harm.
4.Evidence that the plaintiffs continued to invest despite knowing the defendants had an insufficient number of thoroughbreds. The plaintiffs knew the defendants were giving them quarter hors es instead of the promised thoroughbreds. No one disputes that, except the majority which states in footnote 4 that “there is no evidence that Plaintiffs had any knowledge of these facts,” ie., “the overselling of mare leases.” Yet the plaintiffs continued to invest in the mare-lease program and in some instances reinvested. Their willingness to stick with the defendants regardless of whether they delivered the program’s main profit-making asset could lead a jury reasonably to conclude that the plaintiffs were primarily concerned with tax deductions rather than horse breeding. While the quarter-horse substitution may be immaterial to the question of whether the plaintiffs knew of the program’s under-capitalization (as the majority asserts), it is *501 material to the plaintiffs’ state of mind, which in turn reaches the issue of causation. A jury could conclude that the plaintiffs intended to take tax breaks regardless of the investments’ underlying substance. This conclusion, along with the other evidence, could justify a finding that the plaintiffs’ overriding intention to avoid taxes was the real cause of their losses.
In sum, when the evidence is viewed collectively, a colorable version of events favorable to the defendants’ argument on causation emerges. In this scenario, the plaintiffs knew their tax attorneys were selling them a scheme, knew they were not receiving a full complement of thoroughbred foals for racing or sale, knew that the company from which they were taking long-term loans was an arm of ClassicStar in violation of the risk requirements of the tax law, and refused to seek independent counsel on the validity of their tax deductions. Despite the warning signs, the plaintiffs plunged headlong into the mare-lease program for the tax breaks, heedless of whether those breaks had any legal basis. In this scenario, the cause of the plaintiffs’ losses was not the defendants’ fraud but the plaintiffs’ greed. Perhaps a jury would agree with the version of events that the plaintiffs, the district court, and my colleagues spin. But there is a reasonable basis in the record for the alternative conclusion, and that is all that is required for the defendants to survive summary judgment. The defendants should be permitted an attempt to persuade a jury that the plaintiffs caused their own injuries. On this record, that is what the Seventh Amendment demands.
III. The Prejudgment Interest Award
Given this conclusion, I would vacate the entirety of the $65 million damages and remand the case for-trial, as the Seventh Amendment' requires. But even if I believed summary judgment for the plaintiffs were warranted, I would vacate the $15.6 million prejudgment interest. Assuming for the sake of argument that prejudgment interest should ever be awarded on top of statutory treble damages, the district court’s award was erroneous under the circumstances. The majority correctly explains that federal law is used to determine prejudgment interest on a federal claim such as RICO, but it fails to acknowledge that the district court did not apply federal law. The district court imposed the state statutory interest rate of eight percent after determining the plaintiffs’ damages were “liquidated” under Kentucky law. But whether damages are “liquidated” — a term that Kentucky apparently applies beyond the normal situation of contractual stipulation — is irrelevant under federal law. Under federal law, whether to award prejudgment, interest is a matter of equity guided by the need to ensure full compensation, to avoid overcompensation, and to achieve fairness. See Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 92 L.Ed. 3 (1947). While a federal court may consult state law as part of its equitable inquiry, it is manifest error for the court to ignore federal law altogether and to mechanically apply a state statutory rate or a state “liquidated damages” penalty. The majority suggests some rationales by which the district court might have concluded that prejudgment interest at the Kentucky statutory rate was fair, but the district court did not actually rely on those rationales in its opinion. Proper Concern for federal equitable standards might have caused the district court to decline to pile $15 million prejudgment interest on top of $16 million actual damages that had already been trebled.

. In full, the Amendment reads, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.”

. Many judges and legal scholars have recently complained that federal civil procedure— summary judgment in particular — is deviating more and more from Seventh Amendment standards requiring trial by jury. See Judge Mark Bennett’s recent essay on this subject, From the "No Spittin’, No Cussin and No Summary Judgment” Days of Employment Discrimination Litigation to the “Defendant's Summary Judgment Affirmed Without Comment” Days: One Judge’s Four-Decade Perspective, 57 N.Y.L. Sch. L.Rev. 685 (2012-2013).